POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUSTAFA OMAR ALJENDAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BEYOND MEAT, INC., ETHAN BROWN, and LUBI KUTUA,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Mustafa Omar Aljendan ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the

Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Beyond Meat, Inc. ("Beyond Meat" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Beyond Meat securities between February 27, 2025 and November 11, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Beyond Meat operates in the food industry, developing, manufacturing, marketing, and selling plant-based meat products under the "Beyond" brand name in the U.S. and internationally.  The Company owns and leases multiple production, warehousing, research and development ("R&D"), and other properties in the U.S. and abroad.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.      Since at least early 2025, facing shrinking demand for its products and ballooning debt and losses, Beyond Meat's primary goal has been to achieve operations with positive earnings before interest, taxes, depreciation and amortization ("EBITDA") by the end of 2026.  Indeed, on February 26, 2025, during Beyond Meat's earnings call for the fourth quarter ("Q4") and full year ("FY") of 2024, the Company's President, Chief Executive Officer ("CEO"), and founder, Defendant Ethan Brown ("Brown"), stated that "I want everybody entirely focused on that" goal.

4.      At all relevant times, Defendants consistently and repeatedly touted their focused efforts to achieve EBITDA-positive operations by year-end 2026. Accordingly, throughout the Class Period, Defendants repeatedly emphasized that they were rigidly focused on operating expense reduction, gross margin expansion, and broader operational efficiency and optimization at the expense of other aspects of the Company's business, such as revenue growth, which they explicitly deemphasized as a business concern.

5.      Notwithstanding the foregoing, at all relevant times, Defendants disclosed no anticipated or actual need to record significant asset impairment charges attributable to certain of Beyond Meat's long-lived assets, including its property, plant, and equipment ("PP&E"), operating lease right-of-use ("ROU") assets, or prepaid lease costs.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value, making it highly likely that the Company would be required to record a material, non-cash impairment charge; (ii) the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

7.      The truth began to emerge on October 24, 2025, when, during pre-market hours, Beyond Meat filed a current report on Form 8-K with the SEC, reporting the Company's preliminary financial results for the third quarter ("Q3") of 2025.  Therein, Defendants revealed that the Company "expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets," which it "expected to be material."

8.      On this news, Beyond Meat's stock price fell $0.655 per share, or 23.06%, to close at $2.185 per share on October 24, 2025.

9.      On November 3, 2025, during pre-market hours, Beyond Meat issued a press release announcing that it would delay reporting its financial results for Q3 2025, citing the need for additional time to complete its impairment review.

10.    On this news, Beyond Meat's stock price fell $0.265 per share, or 16.01%, to close at $1.39 per share on November 3, 2025.

11.    On November 10, 2025, during post-market hours, Beyond Meat issued a press release announcing its financial results for Q3 2025.  Among other results, Beyond Meat reported that its loss from operations for the quarter was $112.3 million, which included "***$77.4 million*** in non-cash impairment charges related to certain of the Company's long-lived assets."[1]

12.    On this news, Beyond Meat's stock price fell $0.12 per share, or 8.96%, to close at $1.22 per share on November 11, 2025.

13.    Then, on November 11, 2025, during post-market hours, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q3 2025.  During the call, the Company's Chief Financial Officer ("CFO") and Treasurer Defendant Lubi Kutua ("Kutua" and, collectively with Defendant Brown, the "Individual Defendants") disclosed, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet."

14.    On this news, Beyond Meat's stock price fell an additional $0.105 per share, or 8.61%, to close at $1.115 per share on November 12, 2025.

---

[1] All emphases herein are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

15.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Beyond Meat is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

20.    Plaintiff, as set forth in the attached Certification, acquired Beyond Meat securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

6

21.　　Defendant Beyond Meat is a Delaware corporation with principal executive offices located at 888 North Douglas Street, Suite 100, El Segundo, California 90245. Beyond Meat's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BYND".

22.　　Defendant Brown has served as Beyond Meat's President and CEO at all relevant times. Defendant Brown is also the Company's founder.

23.　　Defendant Kutua has served as Beyond Meat's CFO and Treasurer at all relevant times.

24.　　The Individual Defendants possessed the power and authority to control the contents of Beyond Meat's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Beyond Meat's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Beyond Meat, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25.    Defendant Beyond Meat and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

26.    Beyond Meat operates in the food industry, developing, manufacturing, marketing, and selling plant-based meat products under the "Beyond" brand name in the U.S. and internationally.  The Company owns and leases multiple production, warehousing, R&D, and other properties in the U.S. and abroad including, *inter alia*, its corporate headquarters, lab, and innovation space ("Campus Headquarters") in El Segundo, California.

27.    Since at least early 2025, facing shrinking demand for its products and ballooning debt and losses, Beyond Meat's primary goal has been to achieve EBITDA-positive operations by year-end 2026.  Indeed, on February 26, 2025, during Beyond Meat's earnings call for Q4 and FY 2024, the Defendant Brown stated that "I want everybody entirely focused on that" goal.

28.    At all relevant times, Defendants consistently and repeatedly touted their focused efforts to achieve EBITDA-positive operations by year-end 2026. Accordingly, throughout the Class Period, Defendants repeatedly emphasized that they were rigidly focused on operating expense reduction, gross margin expansion, and broader operational efficiency and optimization at the expense of other aspects

of the Company's business, such as revenue growth, which they explicitly deemphasized as a business concern.

29.    Notwithstanding the foregoing, at all relevant times, Defendants disclosed no anticipated or actual need to record significant asset impairment charges attributable to certain of Beyond Meat's long-lived assets, including its PP&E, operating lease ROU assets, or prepaid lease costs.

**Materially False and Misleading Statements Issued During the Class Period**

30.    The Class Period begins on February 27, 2025, the day after Beyond Meat issued a press release during post-market hours reporting its financial results for Q4 and FY 2024.  Therein, Defendants announced, *inter alia*, Beyond Meat's decision to implement certain "restructuring initiatives, including a reduction-in-force and suspension of operational activities in China, as it targets EBITDA-positive run-rate by the end of 2026[.]"  In addition to approximately $1.5 million to $2.5 million in total one-time cash charges related to the reduction-in-force, Beyond Meat advised that it "currently estimates that it will incur one-time non-cash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025."  Apart from the foregoing, Defendants identified no additional anticipated or actual impairment charges.

31.     On March 5, 2025, Beyond Meat filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024 (the "2024 10-K"). The 2024 10-K reported that, as of December 31, 2024, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $308.862 million.

32.     In a section dedicated to discussing impairment of Beyond Meat's long-lived assets, the 2024 10-K stated, in relevant part:

> Long-lived assets are reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be fully recoverable. When events or circumstances indicate that impairment may be present, management evaluates the probability that future undiscounted net cash flows received will be less than the carrying amount of the asset. If projected future undiscounted cash flows are less than the carrying value of an asset, then such assets are written down to their fair values. ***The Company concluded that no long-lived assets were impaired during the fiscal years ended December 31, 2024, 2023 and 2022.***

33.     Notwithstanding the foregoing, the 2024 10-K purported to warn of risks that "may" or "could" materialize related to certain impairment charges for ROU assets and prepaid lease costs, stating, *inter alia*:

> [W]e ***may*** not be able to build out or occupy the rest of the Campus Headquarters and are considering subleasing, assigning or otherwise transferring the unoccupied space, or negotiating a partial lease termination . . . . An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement ***may*** not be completed on terms advantageous to us because the rental rate we receive under the agreement ***may*** not fully cover the rental rate we pay under the Campus Lease for the same space or our subtenants ***may*** fail to make lease payments, ***which may result in***

*impairment charges for [ROU] assets and prepaid lease costs* and *could* have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease *could result in . . . non-cash write-off of prepaid lease costs*, the amounts of which *could* be material and which *could* have a negative impact on our financial condition and results of operations.

Plainly, the foregoing risk warning was a generic, catch-call provision that was not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars.

34.    Likewise, the 2024 10-K downplayed risks that "may" or "could" materialize related to potential future impairment charges more generally, while simultaneously touting Defendants' annual and, at times, more frequent asset impairment analyses, stating, in relevant part:

The preparation of financial statements in accordance with GAAP involves making estimates, judgments and assumptions that affect reported amounts of assets (including intangible assets), liabilities, revenues and expenses. This includes estimates, judgments and assumptions for assessing the recoverability of our assets . . . . *If* any estimates, judgments or assumptions change in the future, the Company *may* be required to record additional expenses and/or impairment charges . . . .

*We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances*, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Our actual results *may* differ from these estimates under assumptions or conditions that *may* change in the future. While *we believe the assumptions and estimates we make are*

11

***reasonable***, any changes to our assumptions or estimates, or any actual results which differ from our assumptions or estimates, ***could*** have a material adverse effect on our financial position and operating results . . . .

***We perform an asset impairment analysis on an annual basis or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable.*** Failure to achieve forecasted operating results, due to weakness in the economic environment or other factors, changes in market conditions and declines in our market capitalization, the planned suspension of our operational activities in China, and failure to negotiate a partial lease termination or sublease, assign or otherwise transfer the unoccupied space of our Campus Headquarters, among other things, ***could*** result in impairment of our assets and adversely affect our operating results.

Plainly, this risk warning, too, was a generic, catch-call provision that was not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars.

35.     Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[,]" and that "the financial statements, and other financial information included in this report, fairly

present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

36.     On May 7, 2025, Beyond Meat issued a press release reporting its financial results for the first quarter ("Q1") of 2025.  Therein, Defendants reported, *inter alia*, that for the quarter, Beyond Meat's loss from operations "included the following charges recorded in operating expenses: $4.6 million in incremental legal fees associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; $1.3 million in non-cash charges arising from specific strategic decisions to increase inventory provision for donation of certain inventory items; and $1.2 million in expenses related to the suspension of our operational activities in China."  Despite addressing the foregoing charges, Defendants failed to identify any material impairment charge associated with Beyond Meat's long-lived assets that could or would amount to potentially tens of millions of dollars.

37.     The same day, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q1 2025.  During the call, an analyst remarked on the Company's one-time charges for the quarter, and asked whether Defendants were aware of "any additional things that are similar to that we should be aware of for the coming couple quarters?"  In response, Defendant Brown stated, in relevant part:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> *[I]n terms of the sort of one-time items, the only thing that at this point I think that's really worth noting is that China, the costs related to the suspension of our activities in China*, that will, [t]he way we are treating those expenses from an accounting perspective is we are taking accelerated depreciation on those expenses through the end of 2026. *And so each quarter, we will call that out, but each quarter there will be some impact related to that decision.*

Significantly, as discussed at ¶ 30, *supra*, Defendants estimated "one-time non-cash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China." Accordingly, Defendant Brown's response above either grossly downplayed the anticipated impact of impairment charges associated with Beyond Meat's suspension of its Chinese operations, or alternatively downplayed the universe of one-time items anticipated to impact the Company's balance sheet over the next couple of quarters.

38.    On May 8, 2025, Beyond Meat filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 29, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q reported that, as of March 29, 2025, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $301.912 million.

39.    The Q1 2025 10-Q also provided generic, boilerplate risk warnings purporting to warn of risks that "may" or "could" materialize in connection with a potential future impairment charge. For example, the Q1 2025 10-Q stated, *inter alia*:

Our substantial investment in manufacturing facilities in China and Europe have exposed and *may* continue to expose us to substantial risks and, as a result, we *may* not realize a return on our investment. For example, although we invested a significant amount to establish local operations in China, in February 2025, we made the decision to suspend our operational activities in China. As such, we have not realized a sufficient return on our investment in China and expect to incur certain cash and non-cash charges in connection with the suspension of our operational activities in China in the first quarter of 2025. As a result of our decision to suspend our operational activities in China, we currently estimate that we will incur accelerated depreciation and other inventory and asset write-offs in China totaling $13.0 million to $14.0 million through the end of 2026, of which $1.5 million in accelerated depreciation related to the reassessment of useful lives of certain assets was recognized in the first quarter of 2025, and the remainder of which is expected to be evenly distributed beginning in the second quarter of 2025 through the end of the fourth quarter of 2026 . . . .

Unforeseen delays in the suspension of our operational activities in China *may* cause us to incur additional expenses. Operating or otherwise repurposing or disposing of our facilities in China *may* require additional capital expenditures and the efforts and attention of our management team and other personnel, which will divert resources from our existing business or operations. In addition, our manufacturing facility in Enschede, the Netherlands *may* not provide us with all of the operational and financial benefits we expect to receive. These and other risks *may* result in our not realizing a return on, or losing some or all, of our investments in China and Europe, which *could* have a material adverse effect on our financial condition and financial performance.

Plainly, the foregoing risk warning was a generic, catch-call provision that was not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

40.     Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by the Individual Defendants.

41.     On August 6, 2025, Beyond Meat issued a press release reporting its financial results for the second quarter ("Q2") of 2025.   Therein, Defendants reported, *inter alia*, that for the quarter, Beyond Meat's loss from operations "included the following charges recorded in operating expenses: $4.5 million in certain non-routine SG&A [selling, general, and administrative] expenses; $2.5 million in incremental legal expenses associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; and $0.5 million in costs related to a partial lease termination of a portion of the Company's campus headquarters building in El Segundo, California[.]"  Despite addressing the foregoing charges, Defendants again failed to identify any material impairment charge associated with Beyond Meat's long-lived assets that could or would amount to potentially tens of millions of dollars.

42.     The same day, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q2 2025.  During the call, Defendant Brown made various representations regarding the Company's focus on optimizing and achieving EBITDA-positive operations, "[m]any of" which he characterized "as an acceleration of existing priorities" that undoubtedly already involved, and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

would continue to involve, an assessment of the carrying value of those operations.

For example, Defendant Brown stated, *inter alia*:

> To stabilize our business and with a goal to achieve EBITDA positive operations within the second half of 2026 and to realize our much longer-term objective of reshaping global protein markets in support of a healthier and more sustainable future, we are taking significant and immediate actions.
>
> **Many of these, which I enumerate below, you will recognize as an acceleration of existing priorities.**
>
> One, we are welcoming John Boken of AlixPartners as interim Chief Transformation Officer to lead and support **our enterprise-wide transformation activities with a focus on operating expense reduction, gross margin expansion and broader operational efficiency**.
>
> Two, **we are intensifying expense reduction globally to fit our operating base into the existing near-term opportunity**. These measures include a reduction in force that we performed today.
>
> * * *
>
> Three, **we are deepening each of our gross margin expansion activities, including continuing to optimize our portfolio by** exiting certain product lines and reconfiguring others, **making additional investments in our facilities around core production lines and select others where we see opportunities to significantly reduce costs**, working within our supply chain to reduce raw ingredient prices and logistics costs **and further fitting our production operations to current demand levels** so as to realize gross margin recovery even under lower volumes.

Notwithstanding the foregoing representations, during the call, neither of the Individual Defendants mentioned any past, ongoing, or contemplated asset

impairment analyses, much less any potential or anticipated asset impairment charge amounting to tens of millions of dollars.

43.     On August 8, 2025, Beyond Meat filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 28, 2025 (the "Q2 2025 10-Q").  The Q2 2025 10-Q reported that, as of June 28, 2025, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $327.515 million.

44.     The Q2 2025 10-Q also purported to warn of certain risks that "may" or "could" materialize in connection with Beyond Meat's leasing arrangements. For example, the Q2 2025 10-Q stated, *inter alia*:

> Underutilization or cessation of our manufacturing facilities **could** adversely affect our gross margin and other operating results and we **may** be required to . . . write down our long-lived assets, or shorten the useful lives and accelerate depreciation of our assets[.]
>
> *   *   *
>
> We **may** not be able to build out or occupy the rest of the Campus Headquarters and are **considering** subleasing, assigning or otherwise transferring additional unoccupied space, or negotiating further partial lease terminations but **may** be unable to enter into or negotiate such an agreement or partial termination, which **could** have an adverse effect on our operating and financial results. An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement **may** not be completed on terms advantageous to us [and] . . . **may** result in impairment charges for [ROU] assets and prepaid lease costs and **could** have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease **could** result in a penalty payment to exit the lease and non-cash write-off of prepaid lease costs, the amounts

of which **could** be material and which **could** have a negative impact on our financial condition and results of operations.

Plainly, the foregoing risk warning was a generic, catch-call provision that was not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars.

45.    In addition, the Q2 2025 10-Q contained substantively the same boilerplate risk warning as referenced in ¶ 39, *supra*, purporting to warn of risks that "may" or "could" materialize in connection with a potential future impairment charge, which was similarly not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars.

46.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by the Individual Defendants.

47.    The statements referenced in ¶¶ 30-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements

and/or failed to disclose that: (i) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value, making it highly likely that the Company would be required to record a material, non-cash impairment charge; (ii) all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

48.     In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Beyond Meat to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose, *inter alia*, the likelihood of recognizing a material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge could amount to tens of millions of dollars, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

49.     The truth began to emerge on October 24, 2025, when, during pre-market hours, Beyond Meat filed a current report on Form 8-K with the SEC, reporting its preliminary financial results for Q3 2025 (the "Q3 2025 8-K").

20

Therein, Defendants revealed that the Company expected to record a "material," unquantified non-cash impairment charge related to certain of its long-lived assets, stating, in relevant part:

> **[T]he Company expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets.** The Company's recoverability test . . . preliminarily indicated that the carrying amount of certain of its long-lived assets was not recoverable from the projected undiscounted future cash flows of the relevant asset group. ***Although the impairment charge is expected to be material, the Company is not yet able to reasonably quantify the amount at this time.***

50.    The foregoing disclosure gained immediate media attention.  For example, the same day during pre-market hours, *The Wall Street Journal* published an article entitled "Beyond Meat Expects Impairment Charge, Revenue In Line With Target", which likewise noted that the Company "anticipated a noncash impairment charge tied to some long-lived assets" that "it expects . . . to be material," but "can't yet quantify the amount."  The same day, other news outlets that regularly cover the securities markets similarly reported on the foregoing disclosure, including, *inter alia*, *Benzinga* in an article entitled "Beyond Meat Stock Slips, Traders Chew On Q3 Estimates", which noted, *inter alia*, that the "large non-cash impairment" "mean[s] the book value of some long-term assets (factories, equipment, etc.) is higher than what they're worth and those assets must be 'written down.'"

51.    Also on October 24, 2025, multiple analysts issued notes addressing Beyond Meat's disclosures in the Q3 2025 8-K.  For example, Mizuho Securities USA ("Mizuho") stated, in relevant part, that "[a]lthough non-cash in nature, the charge reinforces a more subdued multi-year outlook for operations" and "confirm[s] our reduced estimates for LT [long-term] 10-yr U.S. plant-based meat category sales ($2.4B from prior $4B)."  Similarly, BTIG stated, in relevant part, that "we think the [Company's] primary motivation [for filing the Q3 2025 8-K] was to foretell the large asset impairment charge coming with 3Q earnings" and that "[w]e remain on the sidelines as we continue to see no recovery in sales trends, no progress towards sustainable financials with cash burn likely worse than last year, and tough financing arrangements[.]"

52.    Following Beyond Meat's filing of the Q3 2025 8-K, the Company's stock price fell $0.655 per share, or 23.06%, to close at $2.185 per share on October 24, 2025.

53.    On November 3, 2025, during pre-market hours, Beyond Meat issued a press release announcing that it would delay reporting its financial results for Q3 2025 (the "Q3 2025 Delay Notice"), citing the need for additional time to complete the previously disclosed impairment review.  Specifically, the press release stated, in relevant part:

> Beyond Meat . . . is rescheduling the reporting of its financial results for the third quarter ended September 27, 2025 to Tuesday, November 11, 2025 after market close.

> As previously disclosed on Form 8-K filed on October 24, 2025, the Company expects to record a non-cash impairment charge for the three months ended September 27, 2025 related to certain of its long-lived assets. Although the Company expects this charge to be material, the Company is not yet able to reasonably quantify the amount, and requires additional time, resources and effort to finalize its assessment, and therefore is rescheduling its previously-announced conference call to Tuesday, November 11, 2025.

54. This disclosure, too, was the subject of considerable and immediate media attention, including articles published by a slew of media outlets the same day. For example, in an article entitled "Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results", *Bloomberg* reported that "Beyond Meat shares are down 8.2% in premarket trading after the plant-based protein company postponed the release of its 3Q results to Nov. 11 as it finalizes an assessment of a material non-cash impairment charge tied to certain long-lived assets." Similarly, in an article entitled "Beyond Meat delays quarterly earnings report to November 11", *Reuters*, too, reported that the Q3 2025 Delay Notice had resulted in a sharp decline in Beyond Meat's stock price, stating that the Company "is delaying its third-quarter results report by a week as it requires more time to quantify an impairment charge related to some of its assets, sending its shares about 12% lower in early trading on Monday." *Yahoo! Finance*, *Business Insider*, *Seeking Alpha*, and *TalkMarkets*, among other investor news outlets, similarly reported on the decline in Beyond Meat's stock price as investors digested the Company's disclosures in the Q3 2025 Delay Notice.

55.    Ultimately, following Beyond Meat's publication of the Q3 2025 Delay Notice, the Company's stock price fell $0.265 per share, or 16.01%, to close at $1.39 per share on November 3, 2025.

56.    On November 10, 2025, during post-market hours, Beyond Meat issued a press release reporting its financial results for Q3 2025 (the "Q3 2025 Earnings Release").  Among other results, Beyond Meat reported that its loss from operations for the quarter "was $112.3 million, or operating margin of -160.0%, compared to loss from operations of $30.9 million, or operating margin of -38.2%, in the year-ago period[,]" which "included ***$77.4 million*** in non-cash impairment charges related to certain of the Company's long-lived assets."

57.    On this news, Beyond Meat's stock price fell $0.12 per share, or 8.96%, to close at $1.22 per share on November 11, 2025.

58.    Then, on November 11, 2025, during post-market hours, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q3 2025 (the "Q3 2025 Earnings Call").  During the call, Defendant Kutua disclosed, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet."

59.    Following the Q3 2025 Earnings Call, Beyond Meat's stock price fell an additional $0.105 per share, or 8.61%, to close at $1.115 per share on November 12, 2025.

60.    As with the Q3 2025 8-K and Delay Notice, Defendants' disclosures in the Q3 2025 Earnings Release and Call shocked the market.  For example, on November 10, 2025, investor news website *Stocktwits* published an article entitled "Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment", reporting that the Company's "shares tumbled 9% in after-hours trading on Monday after the company's quarterly report revealed [*inter alia*] . . . [the] significant impairment charge."  Similarly, during pre-market hours the following day, *The Motely Fool* published an article entitled "No Bottom in Sight for Beyond Meat's Crashing Sales", stating, in relevant part, that the "impairment charge of $77.4 million against long-lived assets in the third quarter . . . dragged down the [Company's] bottom line."  Between November 10 and 11, 2025, various other news outlets including, *inter alia*, *The Wall Street Journal*, *Reuters*, and *Seeking Alpha* similarly published articles addressing Defendants' disclosures in the Q3 2025 Earnings Release and Call.

61.    Multiple analysts, too, reacted negatively to Defendants' disclosures in the Q3 2025 Earnings Release and Call.  For example, on November 11, 2025, Barclays Research published a note stating that Beyond Meat's "[p]rofits were overall weaker than expected as [it] faced a significant non-cash impairment charge of $77.4mn related to certain long-lived assets" and that "[b]ottom line was a significant miss due to the aforementioned one-time costs as well as a significant increase in interest expense."  Similarly, the same day, Mizuho published a note

stating that Beyond Meat's "[r]esults confirmed a sizable impairment charge ($77MM) and Q4 revenue guided below consensus[, which] implies weaker yr/yr growth vs. Q3 despite softer comp." BTIG issued a similar note on November 12, 2025, stating, *inter alia*, that "we don't have enough confidence the [Company's] business can return to sustainable, positive EBITDA" within the next two years, and that Defendants' "gross margin outlook has consistently been overly optimistic[.]"

62. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

63. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. Indeed, at all relevant times, Defendants repeatedly emphasized their efforts to optimize Beyond Meat's operations, including reducing operating expenses, expanding gross margin, and broadening operational efficiencies to achieve their primary goal of achieving EBITDA-positive operations by year-end 2026—efforts presumably requiring Defendants to be highly attentive, at a granular level of detail, to the Company's operational performance and assets, including those assets' performance and carrying value. Defendants also made highly specific statements regarding these assets and

26

attendant impairment charge risks in periodic financial reports filed with the SEC and earnings releases and conference calls throughout the Class Period, as alleged *supra*.  As such, Defendants were undoubtedly aware of the true performance and carrying value of Beyond Meat's long-lived assets, including the Company's PP&E, operating lease ROU assets, and prepaid lease costs, at all relevant times. Yet, throughout the Class Period, Defendants failed to disclose that they would likely need to record those assets as significantly impaired.   Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

64.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Beyond Meat securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Beyond Meat securities were

actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Beyond Meat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Beyond Meat;

28

- whether the Individual Defendants caused Beyond Meat to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Beyond Meat securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

70.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Beyond Meat securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Beyond Meat securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

73. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Beyond Meat securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Beyond Meat securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Beyond Meat securities.  Such reports, filings, releases and statements were materially false and

31

misleading in that they failed to disclose material adverse information and misrepresented the truth about Beyond Meat's finances and business prospects.

77.    By virtue of their positions at Beyond Meat, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Beyond Meat, the Individual Defendants had knowledge of the details of Beyond Meat's internal affairs.

79.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Beyond Meat.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate

timely, accurate, and truthful information with respect to Beyond Meat's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Beyond Meat securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Beyond Meat's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Beyond Meat securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

80.    During the Class Period, Beyond Meat securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Beyond Meat securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Beyond Meat securities was substantially lower than the prices paid by Plaintiff and the other

33

members of the Class.  The market price of Beyond Meat securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

83.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.    During the Class Period, the Individual Defendants participated in the operation and management of Beyond Meat, and conducted and participated, directly and indirectly, in the conduct of Beyond Meat's business affairs.  Because of their senior positions, they knew the adverse non-public information about

Beyond Meat's misstatement of income and expenses and false financial statements.

85.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Beyond Meat's financial condition and results of operations, and to correct promptly any public statements issued by Beyond Meat which had become materially false or misleading.

86.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Beyond Meat disseminated in the marketplace during the Class Period concerning Beyond Meat's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Beyond Meat to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Beyond Meat within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Beyond Meat securities.

87.     Each of the Individual Defendants, therefore, acted as a controlling person of Beyond Meat.  By reason of their senior management positions and/or being directors of Beyond Meat, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Beyond Meat to engage in

the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Beyond Meat and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Beyond Meat.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: January 23, 2026                Respectfully submitted,

POMERANTZ LLP

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS