POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiffs*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MUSTAFA OMAR ALJENDAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BEYOND MEAT, INC., ETHAN BROWN, and LUBI KUTUA,<br><br>Defendants. | Case No.  2:26-cv-00742-FMO-PVC<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

1

**TABLE OF CONTENTS**

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ............................................................................7

PARTIES.................................................................................................................8

CONFIDENTIAL WITNESSES .........................................................................10

SUBSTANTIVE ALLEGATIONS .....................................................................11

    A.    Background .....................................................................................11

    B.    Beyond Meat's Reporting Obligations as a Public Company ............13

        1.    Background of GAAP.................................................................13

        2.    Accounting for Inventory..........................................................15

        3.    Accounting for Debt Issuance Costs.........................................16

        4.    Accounting for Long-Lived Assets............................................16

    C.    Beyond Meat's Revenues Were In Substantial Decline .....................21

    D.    Defendants Act To Address Beyond Meat's Decline .........................22

    E.    Defendants Initiate the Exchange Transaction to Save The Company .......................................................................................................23

    F.    Defendants Assured Investors Throughout the Class Period that Beyond Meat's Financial Reporting Complied with GAAP ..............25

    G.    Throughout the Class Period, Beyond Meat's Financial Statements Were Not Compliant With GAAP .....................................................28

    H.    Defendants Knew or Recklessly Disregarded the Inventory and Long-Lived Asset Impairments and Material Weaknesses Long Before Disclosing Them to Investors...........................................................31

Materially False and Misleading Statements Issued During the Class Period .......38

    A.    Misstatements in Connection with Beyond Meat's Q4 and FY24 Financial Disclosures .....................................................................39

    B.    Misstatements in Connection with Beyond Meat's Q1 2025 Financial Disclosures .....................................................................................43

    C.    Misstatements in Connection with Beyond Meat's Q2 2025 Financial Disclosures .....................................................................................50

    D.    Misstatements in Connection with Beyond Meat's Q3 2025 Financial Disclosures .....................................................................................56

THE TRUTH BEGINS TO EMERGE ................................................................59

SCIENTER ALLEGATIONS..............................................................................66

i

A.      Individual Defendants' High-Level Positions Within Beyond Meat..68

B.      Inventory and Asset Valuations Were Essential to Beyond Meat ......69

C.      Corporate Scienter.................................................................................70

PLAINTIFFS' CLASS ACTION ALLEGATIONS ..............................................70

COUNT I...............................................................................................................73

COUNT II .............................................................................................................76

PRAYER FOR RELIEF .......................................................................................77

DEMAND FOR TRIAL BY JURY ......................................................................78

ii

Court-appointed co-lead Plaintiffs Brandon Mitchell Waldaias, Aaron Saran, and Brandon Barclay (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, for their amended complaint against Defendants (defined below), allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, the investigation conducted by Plaintiffs' counsel.

This investigation included, among other things, a review and analysis of: (i) Beyond Meat, Inc.'s ("Beyond Meat" or the "Company") public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports prepared by securities and financial analysts concerning Beyond Meat; (iii) transcripts of Beyond Meat's investor conference calls; (iv) Beyond Meat investor presentations; (v) reports by the financial press concerning Beyond Meat; (vi) Beyond Meat's securities pricing data; (vii) interviews of former Beyond Meat employees; (viii) consultations with experts; and (ix) other material and data identified herein. Plaintiffs' Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Beyond Meat securities between February 27, 2025 and March 31, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

1

2.      This action arises out of false or misleading statements by Defendants Beyond Meat and its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). Throughout the Class Period, Defendants made multiple material misrepresentations and omissions concerning the value of the Company's long-lived assets, inventory, and expenses associated with a transaction in which over $1 billion of Beyond Meat's debt was exchanged for equity (the "Exchange Transaction"), as well as the adequacy of the Company's internal control over financial reporting.

3.      Specifically, Defendants misrepresented that the Company's (i) long-lived assets were worth between $300-328 million during the first and second fiscal quarters of 2025 ("Q1 2025" and "Q2 2025," respectively) and that these long-lived assets were not impaired; (ii) $14.1 million in "pre-paid expenses and other current assets" on its balance sheet were assets, not costs the Company failed to expense; (iii) inventory was worth $100-110 million in Q1 2025 after recording all required provisions for excess and obsolete inventory, Q2 2025, and the third fiscal quarter of 2025 ("Q3 2025"); (iv) non-current prepaid lease costs were between $52-$69 million during Q1 2025 and Q2 2025; and (v) disclosure controls and procedures and internal control over financial reporting were effective and not affected by any material weaknesses.

4.      These misstatements also concealed the extent of the material risks that Beyond Meat's financial statements were inaccurate, that there were material weaknesses in its internal control over financial reporting, and that the Company could not file its financial statements in a timely fashion. The misstatements also had the effect of misrepresenting the Company's losses from operations in Q1, Q2, and Q3 2025. They also had the effect of misstating ***Beyond Meat's gross margin in Q1 2025 by 501%***, a metric that Defendants emphasized was one of the Company's key performance goals and one of the four "most important financial

2

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

performance measures used to link 'compensation actually paid' to" the Company's executive officers. As the truth slowly emerged that *the Company's financial statements were riddled with errors*, and the risks concealed by those errors materialized, Beyond Meat's share price *plummeted by 61%*, devastating investors.

5.      Beyond Meat operates in the food industry, developing, manufacturing, marketing, and selling plant-based meat products under the "Beyond" brand name in the U.S. and internationally. The Company owns and leases multiple production, warehousing, research and development ("R&D"), and other properties in the U.S. and abroad.

6.      Beyond Meat went public in 2019 as the darling of Wall Street with its share price skyrocketing from over $25 to over $200 in a matter of weeks. By the end of 2021: its net revenues had surged from $298 million to $465 million; it had entered into a 12-year $178 million lease of 282,000 square feet of space for its corporate headquarters and research center; and its coffers were flush with cash from an issuance of $1 billion in convertible senior notes due in 2027 ("2027 Notes"). In fact, by the end of 2021, Beyond Meat boasted $733 million in cash on its balance sheet.

7.      Almost immediately after its dizzying rise, however, the Company began an inexorable decline and in 2025 found itself with only $275 million in revenues, $102 million in cash, and debt of $1.142 billion coming due in less than two years. In fact, midway through the Class Period, industry watchdogs revealed that the Company had been letting bills languish unpaid and speculated that, in large part because of the 2027 Notes, Beyond Meat was on the verge of bankruptcy.

8.      Defendants knew that they had to find a way to get the 2027 Notes off their balance sheet, and throughout the Class Period emphasized the accuracy of the Company's financial statements, especially in terms of the value of its inventory. Accordingly, Defendants disclosed $300-328 million in long-lived assets in Q1 and

3

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Q2 2025 and inventory of $100-110 million in Q1, Q2, and Q3 2025, amounts they assured investors were accurate. Indeed, at no time did Defendants disclose that they anticipated needing to record significant asset impairment charges attributable to certain of Beyond Meat's long-lived assets, including its property, plant, and equipment ("PP&E") (*e.g.*, its corporate headquarters and research facility), operating lease right-of-use ("ROU") assets, or prepaid lease costs.

9. On the basis on these and other statements, on September 29, 2025, (just after the end of the Company's third fiscal quarter on September 27, 2025) Defendants announced that they had commenced the Exchange Transaction. As part of the announcement of the Exchange Transaction, Defendants also disclosed that 47% of holders of the 2027 Notes ("2027 Noteholders") had already agreed to participate.

10. Under the terms of the Exchange Transaction, 2027 Noteholders could tender their 2027 Notes as part of an "early settlement" by October 10, 2025, with an ultimate deadline to tender 2027 Notes of October 28, 2025. Rights to withdraw tendered 2027 Notes and revoke consent terminated on October 10, 2025, however, and the Exchange Transaction was scheduled to settle on October 30, 2025.

11. Virtually all 2027 Noteholders tendered their 2027 Notes prior to October 10, 2025. In a proxy dated October 17, 2025, Defendants disclosed that $1,114,603,000 in aggregate principal amount of the 2027 Notes was tendered as part of the early settlement process, "representing 96.92%" of Noteholders. Although the massive dilution of existing shareholders caused the Company's share price to fall 81.75% from $2.85 on September 26, 2025, the last trading day before the Exchange Transaction was announced, to only $0.52 cents on October 16, 2025, investors, sensing a bargain—and trusting Defendants' representations about the Company's accounting and balance sheet—rushed in to invest. The stock soared back to $3.62, and Beyond Meat was saved. Or so it appeared.

4

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12.     On October 24, 2025, only a week after the October 17 proxy statement revealed that the Exchange Transaction was a *fait accompli*, and after 2027 Noteholders had lost their ability to revoke their tenders, Beyond Meat filed a current report on Form 8-K with the SEC, reporting the Company's preliminary financial results for Q3 2025. The release revealed to astonished investors that the Company "expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets," which it "expected to be material." On this news, Beyond Meat's stock price fell $0.66 per share, or 23.06%, to close at $2.19 per share on October 24, 2025.

13.     Then, on November 3, 2025, during pre-market hours, Beyond Meat issued a press release announcing that it would delay reporting its financial results for Q3 2025, citing the need for additional time to complete its impairment review. On this news, Beyond Meat's stock price fell $0.27 per share, or 16.01%, to close at $1.39 per share on November 3, 2025.

14.     Previously concealed risks continued to emerge on November 7, 2025, when, after markets closed, Defendants filed a Notification of Late Filing on Form 12b-25, which disclosed that, when Beyond Meat eventually was able to file its Q3 2025 10-Q, it would disclose a material weakness in its internal control over financial reporting. On this news, the Company's stock price fell $0.05 per share, or 3.6%, to close at $1.34 per share on November 10, 2025.

15.     Less than a week later, on November 10, 2025, during post-market hours, Beyond Meat issued a press release announcing its financial results for Q3 2025. Among other results, Beyond Meat reported that its loss from operations for the quarter was $112.3 million, which included "***$77.4 million*** in non-cash impairment charges related to certain of the Company's long-lived assets,"[1]

---

[1] All emphases herein are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

including its corporate headquarters and research facility. On this news, Beyond Meat's stock price fell $0.12 per share, or 8.96%, to close at $1.22 per share on November 11, 2025.

16. Then, on November 11, 2025, during post-market hours, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q3 2025. During the call, the Company's CFO and Treasurer Defendant Lubi Kutua ("Kutua" and, collectively with Defendant Ethan Brown ("Brown"), the "Individual Defendants") disclosed, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet." On this news, Beyond Meat's stock price fell an additional $0.11 per share, or 8.61%, to close at $1.12 per share on November 12, 2025.

17. Although this seemed like the end of the bad news, investors, who had been roiled by the onslaught of disclosures concerning the Company's accounting improprieties, were stunned when, on March 26, 2026, Defendants belatedly disclosed that the filing of its Annual Report on Form 10-K for the 2025 Fiscal Year would be delayed because the Company would disclose *a second material weakness in its internal control over financial reporting*, this time concerning inventory valuations. Following Defendants' disclosure of the second material weakness, Beyond Meat's stock price fell an additional $0.06 per share, or 7.37%, to close at $0.75 per share on March 17, 2026

18. The last of these many shoes dropped on March 31, 2026, when the truth fully emerged and the concealed risks fully materialized, when, after the close of trading, Defendants disclosed that Beyond Meat's quarterly financial statements for the first three fiscal quarters of 2025 contained misstatements, including that (i) the value of the Company's inventory was overstated in each of the first three quarters of 2025, *by a total of $8.5 million*, because Defendants had failed to write

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

off excess and obsolete inventory; (ii) Defendants had *misclassified $14.1 million in costs* related to the Exchange Transaction as assets not expenses; and (iii) the $77.4 impairment of long-lived assets disclosed in November 2025 was overstated by $26.1 million, *i.e.*, that the impairment of long-lived assets was "only" *$51.3 million*. Following Defendants' disclosure of their false statements in each of the first three quarters of 2025, Beyond Meat's stock price fell an additional $0.08 per share, or 11.57%, to close at $0.62 per share on April 1, 2026

19.    Although Defendants assured investors that the six-month string of disclosures of inaccurate financial reporting and material weaknesses in internal control over financial reporting were uncovered in the ordinary course of business, multiple confidential witnesses have disclosed that Defendants knew or recklessly disregarded the truth—that the Company's long-lived assets had been impaired at least since the start of the Class Period, that millions of dollars of inventory had been sitting rotting in the Company's warehouses without being written off, and that the material weaknesses were either known or so apparent that Defendants willfully blinded themselves to them.

20.    In other words, Defendants' drip of collective disclosures had revealed that, in desperately trying to solve the riddle of the 2027 Notes, Defendants had effectively "cooked the books" to make the Company seem in better financial condition than it actually was.

21.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

22.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Beyond Meat is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

25. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

26. Co-lead Plaintiff Brandon Mitchell Waldaias purchased Beyond Meat securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein. *See* ECF No. 28-3.

27. Co-lead Plaintiff Aaron Saran purchased Beyond Meat securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein. *See* ECF No. 28-4.

28. Co-lead Plaintiff Brandon Barclay purchased Beyond Meat securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. His PSLRA certification has been previously

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

filed with the Court and is incorporated by reference herein. *See* ECF Nos. 10-4, 10-5.

29. Defendant Beyond Meat is a Delaware corporation with principal executive offices located at 888 North Douglas Street, Suite 100, El Segundo, California 90245. Beyond Meat's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BYND".

30. Defendant Brown has served as Beyond Meat's President and CEO at all relevant times. Defendant Brown is also the Company's founder.

31. Defendant Kutua has served as Beyond Meat's CFO and Treasurer at all relevant times.

32. The Individual Defendants possessed the power and authority to control the contents of Beyond Meat's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Beyond Meat's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Beyond Meat, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

33. Defendant Beyond Meat and the Individual Defendants are collectively referred to herein as "Defendants."

9

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**CONFIDENTIAL WITNESSES**

34.    Confidential Witness ("CW") 1[2] was an innovation engineer at the Company from prior to the Class Period through midway through the Class Period. He reported to a vice president who reported to Chief Innovation Officer Dariush Ajami ("Ajami"), who reported to Defendant Brown. CW1 worked at the Campus Headquarters "understanding and documenting the production specs" that he received from "product developers, translating their benchtop spec to production to scale it up," doing "pilot testing and pilot production," and helping to transfer the technology to the Company's manufacturing facility in Devault, Pennsylvania.

35.    CW2 was a project engineer at Beyond Meat from July 2023 to March 2025. CW2 reported to Head of Engineering Bernard Susai, who reported to Chief Operations Officer Jonathan Nelson, who reported to Defendant Brown.

36.    CW3 was the Senior Sales Director, Non-Commercial, for Beyond Meat from August 2023 to July 2024. He oversaw all of Beyond Meat's non-commercial food-service business, which included the Compass Group, Aramark, college campuses, stadiums, venues, school districts, concessionaries, non-traditional restaurants like those in an airport or in a business, and hospitals. He reported to then-VP, Head of Food Service Dawn Lockwood, who reported to then-Chief Operating Officer ("COO") Chad Peffer, who reported to Defendant Brown.

37.    CW4 was the Global Quality Director for Strategic Partnerships at Beyond Meat from January 2019 to August 2025. CW4 initially reported to then-Senior VP of Global Quality and Regulatory Compliance Kelli Wilson, before reporting to then-VP of Quality and Regulatory Compliance Dean Antie. CW4 took over for Antie when Antie departed and until Rachel Teoh was hired as the Vice President and Head of Global Food Safety, Quality and Regulatory Compliance in

---

[2] All CWs are referred to in the masculine to preserve their anonymity.

10

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

November 2023. Wilson, Antie, and Teoh reported to Defendant Brown and later to COO, then-SVP of Global Operations Jon Nelson.

38. CW5 stated that he worked with the strategic partners of Beyond Meat, which were considered large Quick Service Restaurant ("QSR") brands. CW5's responsibilities included working with QSR corporate teams and corporate chefs "to make sure the product would meet specifications that were set out from the onset of the project all the way through development of the product, through manufacturing and delivery, and that role stayed with the customer throughout all that, through the life cycle." CW5 further stated that "if there were problems with anything—shipping-wise or any kind of problem—I'd handle the problems with the co-manufacturer and customer, and Beyond Meat. So I was well-versed in all of the inventory stuff as well, and the overproduction of stuff."

39. CW6 stated that he was a manager in distribution at Beyond Meat for two years to just before the start of the Class Period. CW6 worked with various regional distributors to support the sales team, ensure that forecasts were in place, and ensure that product was available to meet demand. CW6 reported to Lockwood who reported to Defendant Brown.

## SUBSTANTIVE ALLEGATIONS

### A. Background

40. Beyond Meat was founded by Defendant Brown in 2009 and operates in the food industry, developing, manufacturing, marketing, and selling plant-based meat products under the "Beyond" brand name in the U.S. and internationally. The Company owns and leases multiple production, warehousing, R&D, and other properties in the U.S. and abroad, but its corporate headquarters, lab, and innovation space is in El Segundo, California ("Campus Headquarters").

41. Beyond Meat's fiscal year begins on January 1 and ends on December 31. Each quarter of the Company's fiscal year is comprised of one 5-week period

11

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and two 4-week periods, with each week ending on a Saturday. Accordingly, Beyond Meat's first fiscal quarter ("Q1") and fourth fiscal quarter ("Q4") may have more or fewer days included than the traditional 91-day second fiscal quarter ("Q2") and third fiscal quarter ("Q3").

42. Beyond Meat offers three plant-based "product platforms" that align with the largest commercial meat categories: beef, pork and poultry. The Company creates its products using proprietary scientific processes that replicate the architecture of animal-based meat using plant-derived amino acids, lipids, carbohydrates, trace minerals, and water.

43. Beyond Meat's flagship product is its "Beyond Burger," which is "designed to look, cook and taste like a traditional beef burger." The Company also sells Beyond Sausage, Beyond Beef, Beyond Meatballs, Beyond Breakfast Sausage Patties, Beyond Breakfast Sausage Links, Beyond Beef Crumbles, Beyond Italian Sausage Crumbles, Beyond Chicken Tenders, Beyond Steak, Beyond Popcorn Chicken, and Beyond Chicken Nuggets.

44. As of December 2025, these products were available in grocery, mass merchandiser, club and "natural" retailer stores, as well as in restaurants, foodservice outlets and schools. In the fourth quarter of 2025, Beyond Meat's products also became available through its Beyond Test Kitchen DTC channel, which it launched in the fourth quarter of 2025.

45. Beyond Meat emphasizes the importance of its technology and food development processes, touting that "[r]esearch, development and innovation are core elements of our business strategy, and we believe they represent a critical competitive advantage for us," and "our team of scientists and engineers focuses on making continuous improvements to our existing product formulations and developing new products across our plant-based beef, pork and poultry platforms."

12

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

46.    Beyond Meat emphasizes the role of its Campus Headquarters in providing the Company with a competitive advantage, touting its "state-of-the-art Innovation Center within our Campus Headquarters [that] brings together leading scientists from chemistry, biology, material science, food science and biophysics disciplines who work together with process engineers and culinary specialists to pursue our vision of perfectly building plant-based meat."

**B. Beyond Meat's Reporting Obligations as a Public Company**

47.    As set forth above and in more detail below, Beyond Meat's equity and debt securities trade on U.S. public markets, and thus the Company is required to file regular financial reports with the SEC. The SEC requires that these reports conform to the standards set by the Financial Account Standards Board ("FASB"). FASB's standards are known collectively as Generally Accepted Accounting Principles ("GAAP").

### 1. Background of GAAP

48.    GAAP constitutes the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.

49.    The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1.

50.    Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate despite footnote or other disclosures, unless the Commission has otherwise provided.

13

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

51.    SEC rules and regulations require that publicly traded companies such as Beyond Meat to include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC (*see* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X). Regulation S-X requires interim financial statements to also comply with GAAP (17 C.F.R. §210.10-01(a)).

52.    FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), Chapter 1, "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." CON 8, Ch. 1 ¶ OB2.

53.    CON 8 provides that financial reports play an important role when individuals and firms make financial decisions:

> General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity. CON 8, Ch. 1 ¶ OB12.

54.    In order for the financial information to be useful, "it must be relevant and faithfully represent what it purports to represent." CON 8, Ch. 3 ¶ QC4. "Relevant financial information is capable of making a difference in the decisions made by users … if it has predictive value, confirmatory value, or both." CON 8, Ch. 3 ¶¶ QC6–QC7. Faithful representation refers to a depiction of an economic phenomena that is "***complete, neutral, and free from error***." [Emphasis in the original.] CON 8, Ch. 3 ¶ QC12. To be free from error does not mean perfectly accurate in all respects; instead, it means that "there are no errors or omissions in

14

the description of the phenomenon, and the process used to produce the reported information was selected and applied with no errors in the process." CON 8, Ch. 3 ¶ QC15.

### 2. Accounting for Inventory

55.    As alleged in further detail below, Beyond Meat reported the value of its inventory on earnings calls, in earnings press releases, and in its quarterly and annual filings with the SEC on forms 10-Q and 10-K, respectively.

56.    GAAP requires Beyond Meat to measure its inventory at the lower of cost and net realizable value.[3] When evidence exists that the net realizable value of inventory is lower than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs. A write-down is appropriate when inventory is excess, obsolete, slow-moving to the point of impaired recoverability, damaged, or otherwise not expected to be sold at an amount that would recover recorded cost. ASC 330-10-35-1B.

57.    Beyond Meat's annual report on Form 10-K with the SEC that reported the Company's financial and operating results for its Q4 and FY 2024 (the "2024 10-K") disclosed the inventory accounting policy that purportedly complied with GAAP:

> Inventories are recorded at lower of cost or net realizable value. The Company accounts for inventory using the weighted average cost method. In addition to product cost, inventory costs include expenditures such as direct labor and certain supply and overhead expenses including in-bound shipping and handling costs incurred in bringing the inventory to its existing condition and location. Inventories are comprised primarily of raw materials, direct labor and overhead costs. Weighted average cost

---

[3] Net realizable value is the "[e]stimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation." ASC 330-10-20

15

method is used to absorb raw materials, direct labor, and overhead into inventory. The Company reviews inventory quantities on hand and records a provision for excess and obsolete inventory based primarily on historical and forecasted demand, estimated shelf life of various raw materials and packaging, work in process and finished goods inventory, as well as the age of the inventory, among other factors.

### 3. Accounting for Debt Issuance Costs

58.    As alleged in further detail below, Beyond Meat also reported the value of certain debt issuance costs in connection with the Exchange Transaction in earnings press releases and in its quarterly and annual filings with the SEC on forms 10-Q and 10-K, respectively.

59.    "A restructuring of a debt constitutes a troubled debt restructuring if the creditor for economic or legal reasons related to the debtor's financial difficulties grants a concession to the debtor that it would not otherwise consider." ASC 470-60-20. Under normal debt accounting, issuance costs are capitalized as a debt discount and amortized. ASC 835-30-45-1A and ASC 835-30-45-3. However, under troubled debt restructuring accounting, all costs must be either deducted in measuring gain on restructuring or expensed immediately as incurred. ASC 470-60-35-12.

### 4. Accounting for Long-Lived Assets

60.    As alleged in more detail below, throughout the Class Period Beyond Meat reported the value of its long-lived assets in earnings press releases and in its quarterly and annual filings with the SEC on forms 10-Q and 10-K, respectively.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

61.    ASC 360, *Property, Plant, and Equipment*, is the authoritative accounting standard which governs the accounting for long-lived assets,[4] including evaluation of these assets for impairment. Impairment is the condition that exists when the carrying amount of a long-lived asset (asset group)[5] exceeds its fair value. ASC 360-10-20.

62.    Long-lived assets (asset group) are subject to two accounting models for assessing their carrying amounts: (1) assets to be held and used and (2) assets to be disposed of by sale (*i.e.*, held for sale). ROU assets should follow the same impairment guidance as other long-lived assets. ASC 842-20-35-9.

63.    Long-lived assets (asset group) classified as held and used, should be tested for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset group may not be recoverable.[6] ASC 360-10-35-21. GAAP provides the following (non-exclusive) examples of such events or changes in circumstances:

- A significant decrease in the market price of a long-lived asset (asset group).

- A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.

---

[4] Long-lived assets may include property, plant, and equipment (e.g., land and improvements, buildings, furniture and fixtures), finite-lived intangible assets, right-of-use assets, and other assets part of an asset or disposal group.

[5] An asset group is the unit of account for a long-lived asset or assets to be held and used, which represents the lowest level for which identifiable cash flows are largely independent of the cash flows of other asset/liability groups. ASC 360-10-20.

[6] The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use or under development. ASC 360-10-35-17.

17

- A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

- An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group).

- A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).

- A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent. ASC 360-10-35-21.

64.    The first step in the impairment test is to determine whether the long-lived assets are recoverable, which is determined by comparing the net carrying value of the asset group to the entity-specific, undiscounted net cash flows to be generated from the use and eventual disposition of that asset group. ASC 360-10-35-17. This is commonly referred to as the recoverability test.

65.    If the assets are not recoverable (*i.e.*, the net carrying value of the asset group exceeds the undiscounted net cash flows), an impairment loss should be recognized based on the amount by which the carrying value of the asset group exceeds its fair value. ASC 360-10-35-17. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. ASC 820-10-20 and ASC 820-10-35-3.

66.    Long-lived assets (asset group) should continue to be classified as held and used until they have met the following held for sale requirements:

- Management, having the authority to approve the action, commits to a plan to sell the asset (disposal group)….

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- The asset (disposal group) is available for immediate sale in its present condition subject only to terms that are usual and customary for sales of such assets (disposal groups).

- An active program to locate a buyer and other actions required to complete the plan to sell the asset (disposal group) have been initiated.

- The sale of the asset (disposal group) is probable, and transfer of the asset (disposal group) is expected to qualify for recognition as a completed sale, within one year . . . . The term probable refers to a future sale that is likely to occur.

- The asset (disposal group) is being actively marketed for sale at a price that is reasonable in relation to its current fair value. The price at which a long-lived asset (disposal group) is being marketed is indicative of whether the entity currently has the intent and ability to sell the asset (disposal group). A market price that is reasonable in relation to fair value indicates that the asset (disposal group) is available for immediate sale, whereas a market price in excess of fair value indicates that the asset (disposal group) is not available for immediate sale.

- Actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. ASC 360-10-45-9.

67.    Beginning in the period the above held-for-sale criteria are met, a long-lived asset (disposal group)[7] should be classified as held for sale and reported at the lower of its carrying value or fair value less cost to sell. ASC 360-10-45-9 and ASC 360-10-35-43.

68.    The following disclosures are required for impairments of long-lived assets classified as held and used in the period the impairment loss is recognized:

---

[7] A disposal group for a long-lived asset or assets to be disposed of by sale or otherwise represents assets to be disposed of together as a group in a single transaction and liabilities directly associated with those assets that will be transferred in the transaction. ASC 360-10-20.

19

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- A description of the impaired long-lived asset (asset group) and the facts and circumstances leading to the impairment.

- If not separately presented on the face of the statement, the amount of the impairment loss and the caption in the income statement or the statement of activities that includes that loss.

- The method or methods for determining fair value (whether based on a quoted market price, prices for similar assets, or another valuation technique)

- If applicable, the business segment in which the impaired long-lived asset (asset group) is reported. ASC 360-10-50-2.

69.     When it is at least reasonably possible that the value of long-lived assets may become impaired in the near term (*i.e.*, the estimates of future cash flows used in the recoverability test or to determine fair value may be particularly sensitive to change) and the effect of the impairment will be material to the financial statements, GAAP requires companies to disclose the nature of the uncertainty of impairment estimate and include an indication that it is at least reasonably possible that a change in the estimate will occur in the near term.

70.     Defendants assured investors that Beyond Meat complied with these requirements. For example, the Company's 2024 10-K represented that:

> Long-lived assets are reviewed by management for impairment whenever events or changes in circumstances indicate that the carrying amount of the asset may not be fully recoverable. When events or circumstances indicate that impairment may be present, management evaluates the probability that future undiscounted net cash flows received will be less than the carrying amount of the asset. If projected future undiscounted cash flows are less than the carrying value of an asset, then such assets are written down to their fair values.

71.     In fact, by touting that Defendants conducted impairment analyses annually *and* whenever circumstances dictated, the 2024 10-K assured investors that Defendants tested impairment of long-lived assets more frequently that what

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

GAAP required. Indeed, Defendants took pains to underscore this by touting elsewhere in the 2024 10-K that "[w]e perform an asset impairment analysis on an annual basis *or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable*."

### C. Beyond Meat's Revenues Were In Substantial Decline

72.    Riding a wave of enthusiasm for plant-based meat products, Beyond Meat went public on May 2, 2019, at $25.00 per share. The Company's share price quickly jumped to $42 per share when trading opened and then closed that day at $65 per share. It continued to skyrocket the following day, when it surged to $87 per share. Its meteoric rise continued unabated over the next several weeks, as the share price exploded to $100 the following month and surpassed $200 a few months later. The IPO was considered the most successful in over 20 years.

73.    Initially, Beyond Meat's performance backed up the soaring share price. The Company reported net revenues of $298 million for 2019, a massive increase of 239% from 2018. Those revenues surged to $407 million in 2020 and $465 million in 2021.

74.    Seeking to capitalize on this enthusiasm from investors and customers, on January 14, 2021, Beyond Meat entered into a 12-year $178 million lease of 282,000 square feet of space for its Campus Headquarters. Two months later, in March 2021, the Company issued the 2027 Notes with a face value of approximately $1 billion. By the end of 2021, Beyond Meat boasted $733 million in cash on its balance sheet.

75.    Beyond Meat's triumphant rise, however, was immediately followed by a crushing, inexorable decline that left the Company fighting for its life by the start of the Class Period in February 2025. The Company's revenues fell from $465 million in 2021 to $419 million in 2022, $343 million in 2023, $326.5 million in 2024, and only $275 million by the end of 2025, a decline of 40.9%. Similarly, its

21

cash and cash equivalents fell from $733 million at the end of 2021 to $309 million by the end of 2022, $190 million by the end of 2023, $131 million by the end of 2024, and only $102 million at the end of Q1 2025, *a decline of 86%*.

## D. Defendants Act To Address Beyond Meat's Decline

76.     As Beyond Meat's decline commenced, Defendants assured investors that they had a plan to keep the Company afloat. For example, in 2022, Defendants announced that Beyond Meat was "pivot[ing] our focus toward sustainable long-term growth supported by three pillars," one of which was "inventory reduction and cash flow generation through more efficient inventory management." Defendants repeated this "pillar" in every SEC filing during the Class Period. In other words, at the forefront of Defendants' efforts in managing the Company was a focus squarely on the amount and value of its inventory.

77.     In November 2023, hard on the heels of their "pivot" to the "pillars," Defendants initiated a review of Beyond Meat's global operations ("Global Operations Review"). This review included "non-cash charges such as provision for excess and obsolete inventory and potential impairment changes, write-offs, disposals and accelerated depreciation of fixed assets, and losses on sale and write-down of fixed assets; further optimization of [Beyond Meat's] manufacturing capacity and real estate footprint." As with the "pillars" "pivot," Defendants emphasized the Global Operations Review in all the Company's Class Period SEC filings.

78.     Defendants also engaged in a series of headcount reductions as a way to cut costs. For example, in October 2022, Beyond Meat announced layoffs of 200 employees—19% of its staff—due to revenue declines. Then in November 2023, it announced a cut of another 19%, or 65 jobs. In February 2025, at the start of the Class Period, the Company announced a reduction of 44 people, or 6% of its workforce, followed by another reduction of another 44 people in August 2025.

22

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

79. In addition to the pillars, Global Operations Review, and headcount reductions, at the start of the Class Period, on February 26, 2025, Defendants also announced that, in connection with the Global Operations Review, Beyond Meat's board of directors had approved a plan to cease the Company's operations in China by the end of the second quarter of 2025, and to that end, Defendants had already laid off approximately 95% of the Company's China workforce.

### E. Defendants Initiate the Exchange Transaction to Save The Company

80. Despite Defendants' efforts, as Beyond Meat's revenues and cash on hand were declining, the 2027 Notes were coming due. At the start of the Class Period, in February 2025, Beyond Meat owed *$1.142 billion* to bondholders, an amount that would only increase in the months before the bonds came due in 2027.

81. With only $102 million cash on hand and $275 million in annual revenues, there was no way the Company could pay the bonds—and the market knew it. For example, on a February 26, 2025 call with analysts and investors to discuss the Company's 2024 fourth quarter and full-year performance ("FY24 Call"), an analyst asked Defendant Kutua, "isn't it fair to say that like the convertible, it matures in two years. Is that kind of the timeframe that you have before you do have to do something much more profound?" Defendant Kutua acknowledged that the Notes' looming maturity was an existential threat to the Company, replying, "I mean, we certainly would have to do something within two years . . . . [W]e said we're going to, in 2025, focus on bolstering the balance sheet, right? And so we're following that plan and we feel pretty good about it."

82. On a call with analysts and investors to discuss the Company's first quarter 2025 performance on May 7, 2025, Defendant Kutua reiterated that Defendants were focused on finding a solution to their problem of their soon-to-mature 2027 Notes and stated that the Company was "continuing to focus on

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

strengthening our balance sheet for the long-term, including evaluating potential transactions to address our [2027 Notes]."

83.    Moreover, during the Class Period, analyst TD Cowen reported that Beyond Meat was in "survival mode" with a "going concern" risk, *i.e.*, the Company was ready to file for bankruptcy. This report was communicated to the wider market in media articles, including an August 22, 2025 article in *TheStreet* entitled, "Analyst: Beyond Meat faces Chapter 11 bankruptcy as cash dwindles." Other industry watchdogs reported that the Company was on the brink of folding as well. On August 21, 2025 *The Food Institute* published an article entitled, "Beyond Meat on the Verge of Financial Ruin" which disclosed that the Company had begun to experience serious delays in paying bills, likely as a strategy for preserving cash, and tied that cash shortage to the Company's massive debt.

84.    After stringing investors along regarding how Beyond Meat could possibly pay 2027 Notes when they came due, on September 29, 2025—just after Q3 had ended on September 27, 2025—Defendants issued a press release ("Exchange Transaction Release") disclosing that the Company had found a way to bail itself out.

85.    The Exchange Transaction Release disclosed that the Company had commenced an offer to exchange its 2027 Notes for "(i) up to $202.5 million in aggregate principal amount of its new 7.00% Convertible Senior Secured Second Lien PIK Toggle Notes due 2030…and (ii) up to 326,190,370 shares of its common stock" ("Exchange Transaction").

86.    In other words, Defendants had effectively obtained a $1 billion bailout by convincing Beyond Meat's creditors to swap their 2027 Notes for a massive amount of stock. The release further disclosed that 47% of the 2027 Noteholders had already agreed to the Exchange Transaction.

24

87. Under the terms of the Exchange Transaction, 2027 Noteholders could tender their 2027 Notes as part of an "early settlement" by October 10, 2025, with an ultimate deadline to tender 2027 Notes of October 28, 2025. Rights to withdraw tendered 2027 Notes and revoke consent terminated on October 10, 2025, however. The Exchange Transaction was scheduled to settle on October 30, 2025.

88. Virtually all 2027 Noteholders tendered their 2027 Notes prior to October 10. In a proxy dated October 17, 2025, Defendants disclosed that $1,114,603,000 in aggregate principal amount of the 2027 Notes was tendered as part of the early settlement process, "representing 96.92% of the aggregate principal amount of the previously outstanding." The Exchange Transaction for all intents and purposes had been completed successfully, and Beyond Meat was saved.

## F. Defendants Assured Investors Throughout the Class Period that Beyond Meat's Financial Reporting Complied with GAAP

89. To support their efforts to close the Exchange Transaction, Defendants consistently assured investors throughout the Class Period that Beyond Meat's financial reports were accurate and complied with GAAP and that the Company was at risk of only modest write-downs or impairments in connection with the cessation of operations in China.

90. For example, on February 26, 2025, Defendants issued a press release disclosing Beyond Meat's Q4 and FY2024 financial performance ("FY24 Release"). there would be a round of layoffs and that the Company would cease operating in China by the end of the second quarter 2025. Defendants then advised that the Company currently estimated that it would incur "one-time noncash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025." Defendants said nothing about any impairment of other long-lived assets.

25

91.     Indeed, on March 5, 2025, Defendants filed Beyond Meat's 2024 10-K, which reported that, as of December 31, 2024, Beyond Meat's consolidated long-lived assets amounted to $308.862 million. Defendants disclosed that none of its long-lived assets were impaired during 2024, and again only cautioned that the Company expected to record between $12 to $17 million in accelerated depreciation and impairment charges related to its planned suspension of operational activities in China.

92.     Further, the 2024 10-K expressly attested to the accuracy of these figures in accordance with GAAP and that the Company's accounting controls and procedures were effective both in the report's body and sworn certifications appended to the report.

93.     Similarly, on May 8, 2025, the Company filed its quarterly report on Form 10-Q with the SEC, reporting Beyond Meat's financial and operating results for its Q1 ended March 29, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q reported that, as of March 29, 2025, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $301.912 million, and that Defendants valued the Company's (i) inventory at $100.068 million; (ii) prepaid expenses and current assets at $19.135 million; (iii) cost of goods sold at $69.796 million; (iv) gross loss at $1.065 million; and (v) loss from operations at $56.199 million; and (vi) net loss at $52.916 million. The Q1 2025 10-Q further disclosed that the Company's gross margin, which Defendants emphasized to investors was one of the Company's "key performance goals," was a negative 1.5%.

94.     Like the 2024 10-K, the Q1 2025 10-Q expressly attested to the accuracy of these figures in accordance with GAAP and that the Company's disclosure controls and procedures were effective both in the report's body and sworn certifications appended to the report.

26

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

95.    Likewise, on August 8, 2025, the Company filed its quarterly report on Form 10-Q with the SEC reporting Beyond Meat's financial and operating results for its Q2 ended June 28, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q reported that, as of June 28, 2025, the Company's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $327.515 million, and disclosed that Defendants valued the Company's (i) inventory at $110.868 million and (ii) prepaid expenses and current assets at $42.596 million. The Q2 2025 10-Q further disclosed that the Company's gross margin, which Defendants emphasized to investors was one of the Company's "key performance goals," was a 11.5%.

96.    Like the 2024 10-K and Q1 2025 10-Q, the Q2 2025 10-Q expressly attested to the accuracy of these figures in accordance with GAAP and that the Company's disclosure controls and procedures were effective both in the report's body and sworn certifications appended to the report.

97.    As a result of these and other disclosures, and Defendants' sworn statements attesting to their accuracy, Defendants were able to save the Company and entice investors to the Company's stock. In the wake of the announcement of the Exchange Transaction, which would massively dilute existing shareholders, the price of the Company's stock plummeted from $2.85 on September 26, 2025, the last trading day before the Exchange Transaction was announced, to only $0.52 cents on October 16, 2025, a decline of 81.75%. Sensing a bargain—and inferring from the 2027 Noteholders' willingness to take equity in exchange for debt that the Company was solvent and truthful in its disclosures—investors ran to invest and the stock soared to $3.62.

27

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## G. Throughout the Class Period, Beyond Meat's Financial Statements Were Not Compliant With GAAP

98. Despite assuring investors that Beyond Meat's financial statements had complied with GAAP and that any charges related to the Company's restructuring efforts had already been accounted for during the first half of 2025, on October 24, 2025, *only one week after the Exchange Transaction had effectively been consummated*, Defendants filed a current report on Form 8-K with the SEC, reporting the Company's preliminary financial results for Q3 2025 (the "Q3 2025 8-K"), which disclosed that the Company would record a not-yet-quantified, but nevertheless material, impairment charge for long-lived assets during Q3 2025.

99. Days later, on November 3, 2025, during pre-market hours, Defendants issued a press release announcing that Beyond Meat would delay announcing its Q3 2025 results (the "Q3 2025 Delay Notice") because the Company needed for additional time to complete the previously disclosed impairment review.

100. The severity of the impairment continued to emerge less than a week later, on November 7, 2025, when Defendants filed a Notification of Late Filing on Form 12b-25, which disclosed that, when Beyond Meat was eventually able to file its Q3 2025 10-Q, the Company would also disclose that its internal control over financial reporting was ineffective because of a material weakness in the Company's internal control over financial reporting purportedly associated with "accounting for non-recurring and complex transactions."

101. On November 10, 2025, during post-market hours, Defendants issued a press release reporting Beyond Meat's financial results for Q3 2025 (the "Q3 2025 Earnings Release"). Defendants disclosed that the Company had recorded a $77.4 million impairment charge related to certain of its long-lived assets, including its property, plant, and equipment ("PP&E")—*e.g.,* the Company's equipment and

Campus Headquarters—operating lease right-of-use ("ROU"), assets, or prepaid lease costs.

102. On November 12, 2025, the Company filed its quarterly report on Form 10-Q with the SEC reporting Beyond Meat's financial and operating results for its Q3 ended September 27, 2025 (the "Q3 2025 10-Q"). In the Q3 2025 10-Q, Defendants reiterated the above disclosure of the $77.4 impairment of long-lived assets, and further disclosed that the material weakness in the Company's internal control over financial reporting was related to "accounting for non-recurring and complex transactions."

103. The Q3 2025 10-Q also included narratives purporting to describe how Defendants identified the impairment of long-lived assets and material weakness. The 10-Q stated that an impairment review was triggered by "lower than expected performance in the three months ended September 27, 2025," "a sustained decline in our stock price, which hit a 52-week low during the third quarter of 2025, resulting in a decrease in market capitalization," and "our determination in the third quarter that the ongoing softness in the plant-based meat category is likely to persist longer than previously anticipated." This purportedly led Defendants to test asset groups where they identified the impairment was recorded.

104. The Q3 2025 10-Q further disclosed that Defendants had identified the material weakness during the Q3 2025 when they were "evaluating the accounting for non-recurring and complex transactions related to compensation, debt, lease and warrant transactions." According to Defendants, Beyond Meat's management had "identified a design and operating deficiency related to our process-level controls associated with the identification and accounting" for non-recurring and complex transactions, and concluded that "inadequate technical resources are currently in place to effectively identify and determine the proper accounting for non-recurring complex transactions."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

105. Although the Q3 2025 10-Q and associated press releases purported to disclose the full truth regarding the impaired long-lived assets and the material weakness in Beyond Meat's internal control over financial reporting, they in fact only told part of the story. The full truth began to emerge and the risks concealed by Defendants' misstatements began to materialize on March 16, 2026, when Defendants issued a press release disclosing that the Company would not be able to timely file its 2025 annual report because of a *second, previously undisclosed, material weakness* in the Company's internal control over financial reporting *related to inventory valuation*.

106. On March 31, 2026, at the end of the Class Period, Defendants finally disclosed the full extent to which Beyond Meat's Class Period financial statements had not complied with GAAP as a result of material weaknesses in the Company's internal control over financial reporting.

107. That day, Defendants issued a press release reporting the Company's FY and Q4 performance (the "FY2025 Release"), which stated that "[d]uring the fourth quarter and full year 2025 financial close procedures, the Company identified errors in its previously issued interim condensed consolidated financial statements for the first three quarters of 2025 relating to (i) inventory valuation, (ii) debt issuance costs, and (iii) the previously disclosed impairment of long-lived assets." Although Defendants self-servingly asserted that they had "determined that the errors identified . . . . were immaterial to the previously issued interim period condensed consolidated financial statements," upon even the slightest inspection it was clear that the misstatements were material to investors.

108. For example, Defendants admitted they had overstated the value of the Company's inventory by $5.9 million at the end of Q1, $6.5 million at the end of Q2, and $8.5 million at the end of Q3 2025 and the company should have recorded inventory write-downs in each of these quarters.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

109.    In addition, Defendants further disclosed that although GAAP required Beyond Meat to expense $14.1 million of costs for professional services related to the Exchange Transaction on its income statement as "selling, general, and administrative expenses," the Company had *capitalized (i.e., recorded as an asset)* the $14.1 million on its balance sheet as "prepaid expenses and other current assets."

110.    Finally, Defendants trumpeted that their initial evaluation of long-lived assets had overstated the impairment by $26.1 million, which—in a shocking coincidence—was almost exactly the amount of the inventory impairment and miscategorization of Exchange Transaction expenses. Nevertheless, Defendants admitted that certain long-lived assets had been impaired by *$51.3 million.*

111.    These belated corrections finally disclosed the extent to which Defendants' financial statements were riddled with errors. Indeed, the Company's gross margin in Q1 2025 alone *was off by 507%*.

112.    As set forth below, however, Defendants knew or recklessly disregarded the impaired assets, overstated inventory, and material accounting weaknesses long before they disclosed them to investors both to ensure that the Exchange Transaction concluded successfully and to entice shareholders to purchase the stock in the wake of the announcement of the transaction.

**H. Defendants Knew or Recklessly Disregarded the Inventory and Long-Lived Asset Impairments and Material Weaknesses Long Before Disclosing Them to Investors**

113.    As set forth above, Defendants asserted that they uncovered impaired long-lived assets and initial material weakness in or about Q3 2025, then uncovered the overstated inventory, miscategorized Exchange Transaction expenses, and material weakness concerning inventory valuation in spring 2026. This self-serving narrative, however, is contradicted by statements from confidential witnesses and Defendants' own disclosures.

31

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

114.    For example, the long-lived assets that Defendants ultimately found to be impaired by $51.3 million consisted of property, plant, and equipment assets, which would include equipment and the Campus Headquarters.

115.    CW2 stated that, as the Global Operations Review was progressing, in late 2024 he was tasked with identifying all of Beyond Meat's North American assets. CW2 stated that he had "three months to travel across North America and Canada to track all of the North American assets."

116.    CW2 stated that Beyond Meat did not have an asset management program, and that as a result the Company had "lost track of the assets they have." Accordingly, CW2 visited warehouses, manufacturers, and co-manufacturers in Oregon, Utah, Montreal, Columbia, Missouri, Pennsylvania, and El Segundo, Salinas, and Valencia, California. These included a co-manufacturer called "Tillamook Smokehouse about 20 minutes outside of Salem, Oregon with some employees there," as well as a co-manufacturer in Salt Lake City, Utah, and massive co-manufacturer called Aliments BVeggie in Montreal, Canada. He also visited two warehouses and productions facilities near Columbia, Missouri, the Devault production facility outside Philadelphia, a storage facility in Valencia, California, and the Campus Headquarters.

117.    CW2 said he identified assets the Company had lost track of and found that many assets he located did not match the assets listed on file at Beyond Meat. CW2 stated that he completed his review before he was laid off in March 2025. Accordingly, Defendants knew of the impaired plant, property & equipment assets by March 2025 at the latest.

118.    Similarly, Defendants also knew that the asset value of the Campus Headquarters was impaired long before disclosing the impairment in November 2025. Beyond Meat's fading fortunes, which commenced in 2022, meant it never fully used all the Campus Headquarters space it had leased.

32

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

119. The Company never fully used its Campus Headquarters in large part because, in the years leading up to the Class Period, it regularly slashed staff. CW1 recalled walking into the Campus Headquarters for an interview in the year before the Class Period began, "and it was so quiet, so empty, and I thought, 'This is odd.' I thought it was maybe because it was a Friday. But it turns out it was always empty."

120. CW1 further stated that Defendants Brown and Kutua knew that Beyond Meat was never going to be able to use all of the space that it leased because "they were trying to find a subletter the whole time I was there." CW1 stated that he learned about the subletting efforts from the Company's building manager, Adam Reyes-Thomas, who was responsible for premises issues like HVAC and for obtaining permits to operate the building, including from the fire department. CW1 further stated that the search for a subletter "wasn't a guarded secret. Everyone was talking about it." In fact, CW1 stated that he had been interviewed by Varda, which told him that they would be renting space at the Company.

121. Indeed, Defendant Brown, as early as the FY24 Call, on February 26, 2025, revealed in response to an analyst's question that, "our facility -- our headquarters facility here in El Segundo, there is some excess space that we may look to sublease." In May 2025, the Company announced that it had returned more than 61,000 square feet of space to its landlord, and in July 2025 the Company subleased 54,749 square feet of space to Varda Space Industries ("Varda"). In short, at the start of the Class Period, Defendants knew that the Company would not use ***more than 40% of the space*** it had leased for $178 million for the remaining eight years of its lease.

122. In addition, Defendants' own disclosures about the circumstances of the impairment review demonstrate that they knew or recklessly disregarded that long-lived assets were impaired at least at the start of the Class Period, if not earlier.

33

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

123.  For example, as set forth above, when Defendants belatedly disclosed that long-lived assets were impaired in October and November 2025, they stated that their impairment review was triggered by "lower than expected performance in the three months ended September 27, 2025," "a sustained decline in our stock price, which hit a 52-week low during the third quarter of 2025, resulting in a decrease in market capitalization," and "our determination in the third quarter that the ongoing softness in the plant-based meat category is likely to persist longer than previously anticipated."

124.  This narrative is not credible, however, given the circumstances that existed at the start of the Class Period. For example, during the Q1 2025 Call, Defendants disclosed that they had "recorded a particularly large inventory provision this quarter," *i.e.*, $4.3 million in total charges related to inventory valuation. According to accounting experts consulted by Plaintiffs, since inventory valuation analysis purportedly took into account historical and forecasted demand for the Company's products, among other factors, this write-down *alone* should have been treated as a triggering event requiring Beyond Meat to test its long-lived assets for impairment as early as Q1 2025, let alone that the actual write down of inventory at the time was the $4.3 plus the $5.86 million inventory overstatement belatedly disclosed. In total, Beyond Meat's inventory was impaired by at least *$10 million* at the end of Q1 2025.

125.  In addition, the other events and conditions that Defendants claim triggered Beyond Meat to test its long-lived assets for impairment (lower than expected performance, sustained decline in stock price reaching a 52-week low, and ongoing softness in the plant-based meat category) also existed prior to Q3 2025.

126.  For instance, in the Q1 2025 Release, Defendants stated Beyond Meat's Q1 performance was so poor and its future outlook so uncertain that the Company was withdrawing its full-year 2025 guidance, thus it is preposterous to

34

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

assert that it was not until poor performance in Q3 2025 that an impairment review was triggered.

127. As far as stock price declines are concerned, the Company's stock had reached new 52-week lows multiple times prior to Q3 2025, including: February 27, 2025, March 3, 2025, March 4, 2025, April 3, 2025, April 4, 2025, April 9, 2025, April 15, 2025, April 16, 2025, April 28, 2025, and May 8, 2025.

128. Further, in the Q1 2025 Release, Defendant Brown stated that "[a]s the first quarter of 2025 progressed to a close, we saw a slowdown in consumption as the uncertain macroeconomic environment likely exacerbated category challenges" in response to which the Company was "doubling down on cost-savings initiatives in support of our goal of achieving run-rate EBITDA-positive operations by year-end 2026."

129. Accordingly, Defendants' rationale for waiting until Q3 2025 to perform an impairment review is not credible, as each of the purported factors that caused the Company to evaluate its long-lived assets for impairment existed well before Q3 2025. Defendants obviously knew of impaired long-lived assets, but rather than disclose them, concealed them. According to accounting experts consulted by Plaintiffs, when a company commits to a restructuring plan that affects its operations or the manner in which it uses its property, plant, and equipment, it must assess whether the change triggers an impairment analysis and/or a revision to the useful lives of its long-lived assets." Since the Company had committed to a restructuring plan in Q1 2025, Defendants understood the existence of impairments long before Q3 2025.

130. As for the overstated inventory, multiple CWs described how the Company's warehouses were packed with unsaleable, obsolete inventory that should have been written off long before Defendants "discovered" the material

35

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

weakness in internal control over financial reporting concerning excess and obsolete inventory.

131. For example, CW1 stated that Beyond Meat had a massive amount of plant-based chicken McNuggets for McDonald's that the Company was trying to get approval to sell in the United States. Beyond Meat could not get approval, however, so "what ended up happening is we'd produce a bunch, freeze it, bag it, then put it away in a storage freezer at El Segundo." CW1 also described a massive amount of "excess burger material" at the Campus Headquarters as well, saying "there were a lot of these labeled in the freezer as if they were ready to be sold, but they never moved them. They just sat there. It was likely produced before I came, but then you've also got the product developer's freezer that was also full of material they had produced." CW1 stated that in August 2025, "their product development freezer was full. They were running out of freezer space." CW1 further stated that Beyond Meat had "pallets and pallets" of plant-based steak filet at the Campus Headquarters as well.

132. CW3 corroborated CW1's account of Beyond Meat's production of a massive amount of plant-based McNuggets that the Company could not sell. CW3 recalled "years' worth" of plant-based McNuggets sitting unsold. CW3 stated that Beyond Meat was aggressively pushing its sales teams to try to sell the product on orders from Defendant Brown. CW3 recalled, "we were trying to push a post-dated product. We were told to say to customers that we had some extra product we produced for a large customer because it didn't meet their standards; that it was a good product that we could sell here, and we had to move it because we made so much of it. We were not allowed to say it came from McDonald's. I think the pitch we were told to give came all the way from the top, from Ethan [Brown] ultimately. He was so hands-on."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

133. CW3 characterized Defendant Brown as a highly aggressive micromanager, saying he "was uber aggressive with the sales team to the point of micromanaging three layers below him. You better make this many calls. It was really crazy stuff for a publicly traded company. Intimidation was his style. It was weird that the CEO of a publicly traded company would call you out of the blue on things. He'd be on a campus at a store and call the account manager. He was trying to track how many calls we made and hold us accountable. He was begging for announcements to make" about sales.

134. CW5 corroborated CW1 and CW3's accounts of large amounts of unsold product at Beyond Meat. CW5 recalled that McDonald's rejected a large amount of Beyond Meat product in 2022, stating that "it was millions and millions of dollars worth of product that was rejected by McDonald's . . . . We got stuck with product they didn't want so Beyond was on the hook for 70 to 80 semi-truckloads of product that was disregarded." CW5 estimated that the value of the product was $80 a case, 64 cases per pallet and 24 pallets per semi-truckload, for a total of at least $8.6 million. CW5 stated that "we know from a shelf life test a product will last two years. I've been giving shelf-life extensions on these products for years trying to get sales to sell it to other customers. There was just way too much product. No one wants B-grade products."

135. CW4 said that the other excess inventory was the Company's "extradit," or a "cereal-like substance that goes into making" Beyond Products. CW4 stated that "as they would formulate and R&D new products, extradit would run, run, run…and there were just so many pallets of extradit that became obsolete because they couldn't use it for new product innovation." CW4 stated that storing the extradit costs $5 a pallet and Beyond Meat had two or three warehouses with thousands of pallets of extradit that wasn't usable.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

136.   CW6 also described how Beyond Meat had massive amounts of unsold inventory that the Company knew was worthless. CW6 stated that at one point prior to the Class Period, the Company did a "load-in" with one of its redistributors, which meant that the redistributor was a sent a bunch of finished product (not nuggets or extradit) that there was no customer commitment to purchase. He said the redistributor protested that Beyond Meat was forcing it to take product that was not selling. While the "load-in" did not involve nuggets or extradit, CW6 confirm that he heard about the problems described by CW1, 3, 4, and 5 while at the Company.

137.   These inventory issues should not be viewed in isolation and instead, tie directly with long-lived assets, such as plant, property and equipment. For instance, if the Company is utilizing space and machinery designed to produce and/or store unusable, immovable, unsellable products, the inventory and the long-lived asset is also impaired.

138.   As a result of Defendants' knowing or reckless disregard of the truth regarding the Company's impaired long-lived assets, overstated inventory, miscategorized Exchange Transaction expenses, and material weaknesses, as alleged below, investors, including Plaintiffs, were lured in by Defendants misstatements and devastated when Beyond Meat's share price plummeted when the truth emerged and the risks concealed by Defendants' statements materialized.

## **MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

139.   Throughout the Class Period, Beyond Meat's financial statements were riddled with errors. Among other things, Defendants made materially false and misleading statements regarding the business and operations of Beyond Meat. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company's inventories were inflated because the Company had

38

not written off unsaleable or obsolete inventory as required by GAAP, (ii) the Company had failed to accurately record millions in costs associated with the Exchange Transaction, and/or (iii) Defendants knew of tens of millions of dollars in long-lived assets that were impaired.

**A. Misstatements in Connection with Beyond Meat's Q4 and FY24 Financial Disclosures**

140.   The Class Period begins on February 27, 2025, the day after Beyond Meat issued the FY24 Release during post-market hours. The FY24 Release disclosed that, as a result of the Global Operations Review, there would be a round of layoffs and that the Company would cease operating in China by the end of the second quarter 2025. Defendants then advised that the Company currently estimated that it would incur "one-time noncash charges of approximately $12.0 million to $17.0 million, primarily related to accelerated depreciation and impairment charges and other write-downs on certain fixed assets in China[,]" "the majority of [which] will be incurred in the first quarter of 2025."

141.   The statements in ¶ 140 above were false and misleading because by touting the Global Operations Review and the non-cash charges that would be incurred in connection with that review, Defendants had an obligation to disclose the entire truth about the review and those charges. Defendants failed to fulfill this obligation because they knowingly or recklessly misrepresented and/or failed to disclose that (i) the Company's inventories were inflated because the Company had not written off unsaleable or obsolete inventory as required by GAAP; (ii) the Global Operations Review had uncovered that the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars, not just $12 million to $17 million of assets concerning the cessation of operations in China, making it highly likely that the Company would be required to record a

material, non-cash impairment charge; and/or (iii) all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC.

142. The disclosures in ¶ 141 above also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"). Item 303 requires Beyond Meat to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants limited their disclosure, however, to impairments concerning Beyond Meat's exit from China, even though Defendants knew from the Global Operations Review that the Company's long-lived assets were already materially impaired. Defendants' limited disclosure was materially false and misleading in violation of Item 303 because the impairments to long-lived assets were known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

143. On March 5, 2025, Beyond Meat filed the 2024 10-K, which reported that, as of December 31, 2024, Beyond Meat's consolidated long-lived assets amounted to $308.862 million.

144. The foregoing statements in ¶ 143 were materially false and misleading because Defendants' knowingly or recklessly misrepresented and/or omitted that Beyond Meat's long-lived assets were already substantially impaired.

145. The 2024 10-K also purported to warn of risks that "may" or "could" materialize related to certain impairment charges for ROU assets and prepaid lease costs, stating, *inter alia*:

> [W]e *may* not be able to build out or occupy the rest of the Campus Headquarters and are considering subleasing, assigning or otherwise transferring the unoccupied space, or negotiating a partial lease termination . . . . An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the

40

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

agreement *may* not be completed on terms advantageous to us because the rental rate we receive under the agreement *may* not fully cover the rental rate we pay under the Campus Lease for the same space or our subtenants *may* fail to make lease payments, *which may result in impairment charges for [ROU] assets and prepaid lease costs* and *could* have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease *could result in . . . non-cash write-off of prepaid lease costs*, the amounts of which *could* be material and which *could* have a negative impact on our financial condition and results of operations.

146. Plainly, the risk warning in ¶ 145 above was a generic, boilerplate provision that contemplated mere hypotheticals and was not tailored to Defendants' actual known risks regarding a likely material impairment charge associated with Beyond Meat's PP&E, operating lease ROU assets, and prepaid lease costs, much less that such an impairment charge amounted to tens of millions of dollars and there was no way Defendants could hope to use or occupy the entire Campus Headquarters given the Company's declining business, headcount reductions, and ongoing active efforts to find an entity to sublet unused space.

147. Likewise, the 2024 10-K downplayed risks that as mere hypotheticals that "may" or "could" materialize related to potential future impairment charges more generally, while simultaneously touting Defendants' annual and, at times, more frequent asset impairment analyses, stating, in relevant part:

The preparation of financial statements in accordance with GAAP involves making estimates, judgments and assumptions that affect reported amounts of assets (including intangible assets), liabilities, revenues and expenses. This includes estimates, judgments and assumptions for assessing the recoverability of our assets . . . . *If* any estimates, judgments or assumptions change in the future, the Company *may* be required to record additional expenses and/or impairment charges . . . .

41

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances*, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Our actual results *may* differ from these estimates under assumptions or conditions that *may* change in the future. While *we believe the assumptions and estimates we make are reasonable*, any changes to our assumptions or estimates, or any actual results which differ from our assumptions or estimates, *could* have a material adverse effect on our financial position and operating results . . . .

*We perform an asset impairment analysis on an annual basis or whenever events or changes in circumstances indicate that a long-lived asset group may not be recoverable.* Failure to achieve forecasted operating results, due to weakness in the economic environment or other factors, changes in market conditions and declines in our market capitalization, the planned suspension of our operational activities in China, and failure to negotiate a partial lease termination or sublease, assign or otherwise transfer the unoccupied space of our Campus Headquarters, among other things, *could* result in impairment of our assets and adversely affect our operating results.

148.   Plainly, the risk warning in ¶ 147 above was a generic, boilerplate provision that contemplated mere hypotheticals and was not tailored to Defendants' actual known risks regarding the material impairment charge associated with Beyond Meat's long-lived assets because the Company's long-lived assets had already suffered substantial impairments in the tens of millions of dollars, which Defendants knew through the results of the Global Operations Review.

149.   Appended as exhibits to the Company's 2024 10-K were certifications signed by Defendants Brown and Kutua pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), in which each of Defendants Brown and Kutua certified that they had "reviewed the annual report on Form 10-K of Beyond Meat Inc. [and] . . . [b]ased on my knowledge [the] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

42

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that the 2024 10-K "fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act" and "fairly presents, in all material respects, the financial condition and results of operations" of Beyond Meat.

150.   Each of the above statements excerpted from the exhibits to Beyond Meat's 2024 10-K was materially false and misleading because the 2024 10-K "omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and did not "fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act" because the 2024 10-K misrepresented and/or failed to disclose that: (i) the Company's inventories were inflated because it had not written off unsaleable or obsolete inventory as required by GAAP and (ii) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars and the Company would be required to record a material, non-cash impairment charge.

**B.  Misstatements in Connection with Beyond Meat's Q1 2025 Financial Disclosures**

151.   On May 7, 2025, Beyond Meat issued a press release reporting its financial results for Q1 of 2025 ("Q1 2025 Release"). In the Q1 2025 Release, Defendants reported, *inter alia*, that for the quarter, Beyond Meat's loss from operations "included the following charges recorded in operating expenses: $4.6 million in incremental legal fees associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; $1.3 million in non-cash charges arising from specific strategic decisions to increase inventory provision for donation of certain inventory items; and $1.2 million in expenses related to the suspension of our operational activities in China."

43

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

152. The statements in ¶ 151 above were false and misleading because Defendants knowingly or recklessly misrepresented and/or failed to disclose that (i) the Company's inventories were inflated because the Company had not written off unsaleable or obsolete inventory as required by GAAP; (ii) the Global Operations Review had uncovered that the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars, making it highly likely that the Company would be required to record a material, non-cash impairment charge; and/or (iii) all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC.

153. The disclosures in ¶ 152 above also violated Item 303 because Defendants limited their disclosure, however, to impairments concerning certain operating expenses, even though Defendants knew from the Global Operations Review that the Company's long-lived assets were already materially impaired. Defendants' limited disclosure was materially false and misleading in violation of Item 303 because the impairments to long-lived assets were known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

154. In the Q1 2025 Release, Defendants valued the Company's (i) inventory at $100.068 million; (ii) prepaid expenses and other current assets at $19.135 million; (iii) prepaid lease costs, non-current at $69.814 million; (iv) cost of goods sold at $69.796 million; (v) gross loss at $1.065 million; and (vi) loss from operations at $56.199 million; and (vii) net loss at $52.916 million.

155. The statements in ¶ 154 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory was correctly valued and expenses related to the Exchange Transaction properly accounted for, the correct value of the Company's:

> a. inventory had been overstated by 6.22%, and was actually $94.207 million;

44

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

  b. prepaid expenses and other current assets had been overstated by 26.94%, and was actually $55.194 million;

  c. cost of goods sold had been understated by 6.95%, and was actually $75.013 million;

  d. gross loss had increased 490%, and was actually $6.282 million;

  e. loss from operations, after adjusting for other factors, was actually $116.553 million, an increase of $60.354 million, or 107.4%, $8.171 million of which was attributable to inventory and Exchange Transaction expense misstatements; and

  f. net loss, after adjusting for other factors, was actually $113.27 million, an increase of $60.354 million, or 114.1%, $8.171 million of which was attributable to inventory and Exchange Transaction expense misstatements.

156. The same day, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results for Q1 2025 ("Q1 2025 Call"). During the call, Defendant Brown observed that the Company "recorded a particularly large inventory provision this quarter," *i.e.*, a writedown of $4.3 million, "as we sought to dispose of certain inventories for strategic reasons. This inclusion in our COGS, which is a non-cash impact, created a strong negative drag on margin for the quarter but should benefit our real inventory carrying costs going forward."

157. By choosing to opine on the size of the inventory provision, Defendants took on an obligation to disclose the full truth, which they breached by failing to disclose the true value of Beyond Meat's inventory. Accordingly, the statements in ¶ 156 above were knowingly or recklessly false and misleading because Defendants misrepresented and/or failed to disclose that the value of the Company's inventory was still inflated by an additional approximately $5.9 million. In addition, by characterizing and calling attention to the "inventory provision," *i.e.*, writedown, the statements in ¶ 156 gave investors the impression that the Company had properly accounted for all its inventory, when it had not, and concealed the

45

material risk that Beyond Meat would not be able to timely file its periodic filings with the SEC.

158. On May 8, 2025, Beyond Meat filed its Q1 2025 10-Q, which reported that, as of March 29, 2025, Beyond Meat's consolidated long-lived assets, including PP&E and operating lease ROU assets, amounted to $301.912 million.

159. The foregoing statements in ¶ 158 were materially false and misleading because Defendants (i) knowingly or recklessly misrepresented the value of Beyond Meat's long-lived assets; (ii) failed to disclose that the Global Operations Review had uncovered that the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars, making it highly likely that the Company would be required to record a material, non-cash impairment charge; and/or (iii) concealed all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC.

160. In the Q1 2025 10-Q, Defendants valued the Company's (i) inventory at $100.068 million; (ii) prepaid expenses and current assets at $19.135 million; (iii) prepaid lease costs, non-current 69.814 million; (iv) cost of goods sold at $69.796 million; (v) gross loss at $1.065 million; and (vi) loss from operations at $56.199 million; and (vii) net loss at $52.916 million.

161. The statements in ¶ 160 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory and long-lived assets were correctly valued and expenses related to the Exchange Transaction properly accounted for, the correct value of the Company's:

   a. inventory had been overstated by 6.22%, and was actually $94.207 million;

   b. prepaid expenses and other current assets had been overstated by 26.94%, and was actually $55.194 million;

   c. cost of goods sold had been understated by 6.95%, and was actually $75.013 million;

46

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

d.  gross loss had increased 490%, and was actually $6.282 million;

e.  loss from operations, after adjusting for other factors, was actually $116.553 million, an increase of $60.354 million, or 107.4%, $8.171 million of which was attributable to inventory and Exchange Transaction expense misstatements; and

f.  net loss, after adjusting for other factors, was actually $113.27 million, an increase of $60.354 million, or 114.1%, $8.171 million of which was attributable to inventory and Exchange Transaction expense misstatements.

162.    The Q1 2025 10-Q further disclosed that the Company's gross margin (*i.e.*, gross profit/loss divided by net revenues) as a negative 1.5%.

163.    The statement in ¶ 162 above was false and misleading, however, as when the Company admitted its accounting errors, it further admitted that its actual gross margin was actually ***negative 10.1%***. In fact, when adjusted for excess depreciation recorded on impaired long-lived assets, the Company's actual gross margin was negative 9.1%, a change of ***507%***. This error was particularly material to investors, because, according to Defendants, gross margin is one of the Company's key performance goals and one of four "most important financial performance measures used to link 'compensation actually paid' to" the Company's executive officers.

164.    The Q1 2025 10-Q also represented that

> Our management, with the participation of our principal executive officer and our principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on that evaluation, our principal executive officer and principal financial officer have concluded that, ***as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective*** to

47

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, *and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate*, to allow timely decisions regarding required disclosure.

165. The statement in ¶ 164 above was false and misleading because, based on Defendants' later admissions, at the time of the statement there necessarily was a material weakness in the Company's internal control and procedures concerning financial reporting, which Defendants knowingly or recklessly failed to disclose.

166. The Q1 2025 10-Q also purported to warn of certain risks that "may" or "could" materialize in connection with Beyond Meat's leasing arrangements. For example, the Q1 2025 10-Q stated, *inter alia*:

Underutilization or cessation of our manufacturing facilities *could* adversely affect our gross margin and other operating results and we *may* be required to . . . write down our long-lived assets, or shorten the useful lives and accelerate depreciation of our assets[.]

* * *

We *may* not be able to build out or occupy the rest of the Campus Headquarters and are *considering* subleasing, assigning or otherwise transferring additional unoccupied space, or negotiating further partial lease terminations but *may* be unable to enter into or negotiate such an agreement or partial termination, which *could* have an adverse effect on our operating and financial results. An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement *may* not be completed on terms advantageous to us [and] . . . *may* result in impairment charges for [ROU] assets and prepaid lease costs and *could* have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease *could* result in a penalty payment to

48

exit the lease and non-cash write-off of prepaid lease costs, the amounts of which *could* be material and which *could* have a negative impact on our financial condition and results of operations.

167.    The boilerplate risk warning in ¶ 166 above was a generic, boilerplate provision that contemplated mere hypotheticals and that was not tailored to Defendants' actual known risks a material impairment charge associated with Beyond Meat's long-lived assets, and was materially misleading for failing to disclose that the Company's long-lived assets were already impaired.

168.    Appended as an exhibit to the Q1 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to Section 302 of SOX, in which Defendants Brown and Kutua each certified that (i) they had reviewed the Q1 2025 10-Q; (ii) the Q1 2025 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading with respect to the period covered by the report"; (iii) the Q1 2025 10-Q's "financial statements, and other financial information . . . fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; and (iv) Defendants Brown and Kutua had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures."

169.    Also appended as an exhibit to the Q1 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to 18 U.S.C. Section 1350, which attested that "[t]he [Q1 2025 10-Q] fully complies with the requirements of Section

49

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)" and "fairly presents, in all material respects, the financial condition and results of operations" of Beyond Meat.

170. Each of the statements and excerpts from the exhibits to Beyond Meat's Q1 2025 10-Q was materially false and misleading because the Q1 2025 10-Q "omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and did not "fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act" because the Q1 2025 10-Q misrepresented and/or failed to disclose that: (i) there was a material weakness in Beyond Meat's internal control over financial reporting; (ii) the Company's inventories were inflated because it had not written off unsaleable or obsolete inventory as required by GAAP; (iii) the Company's prepaid expenses and other current assets were inflated because it had not properly accounted for expenses in connection with the Exchange Transaction; and (iv) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars and the Company would be required to record a material, non-cash impairment charge.

## C. **Misstatements in Connection with Beyond Meat's Q2 2025 Financial Disclosures**

171. On August 6, 2025, Beyond Meat issued a press release reporting its financial results for the second quarter ("Q2") of 2025. Therein, Defendants reported, *inter alia*, that for the quarter, Beyond Meat's loss from operations "included the following charges recorded in operating expenses: $4.5 million in certain non-routine SG&A [selling, general, and administrative] expenses; $2.5 million in incremental legal expenses associated with arbitration proceedings related to a previously-disclosed contractual dispute with a former co-manufacturer; and $0.5 million in costs related to a partial lease termination of a portion of the Company's campus headquarters building in El Segundo, California[.]"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

172. The statements in ¶ 171 above were false and misleading because Defendants knowingly or recklessly misrepresented and/or failed to disclose that (i) the Company's inventories were inflated because the Company had not written off unsaleable or obsolete inventory as required by GAAP; (ii) the Global Operations Review had uncovered that the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars, making it highly likely that the Company would be required to record a material, non-cash impairment charge; (iii) the Company was improperly treating expenses in connection with the Exchange Transaction as assets, not expenses, and/or (iv) all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC.

173. The disclosures in ¶ 172 above also violated Item 303 because Defendants limited their disclosure, however, to impairments concerning certain operating expenses, even though Defendants knew from the Global Operations Review that the Company's long-lived assets were already materially impaired. Defendants' limited disclosure was materially false and misleading in violation of Item 303 because the impairments to long-lived assets were known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

174. In the Q2 2025 Release, Defendants valued the Company's (i) inventory at $110.868 million and (ii) prepaid expenses and current assets at $42.596 million.

175. The statements in ¶ 174 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory was correctly valued and expenses related to the Exchange Transaction and other debt issuance costs properly accounted for, the correct value of the Company's:

> a. inventory had been overstated by 6.26%, and was actually $104.337 million; and

51

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b. prepaid expenses and other current assets had been overstated by 15.21%, and was actually $36.973 million.

176. On August 8, 2025, Beyond Meat filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended June 28, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q reported that, as of June 28, 2025, Beyond Meat's consolidated long-lived assets, including PP&E, and operating lease ROU assets, amounted to $379.787 million.

177. The foregoing statements in ¶ 176 were materially false and misleading because Defendants (i) knowingly or recklessly misrepresented the value of Beyond Meat's long-lived assets; (ii) failed to disclose that the Global Operations Review had uncovered that the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars in long-lived assets, making it highly likely that the Company would be required to record a material, non-cash impairment charge; and/or (iii) concealed all the foregoing was likely to impair Beyond Meat's ability to timely file its periodic filings with the SEC.

178. In the Q2 2025 Release, Defendants valued the Company's (i) inventory at $110.868 million and (ii) prepaid expenses and other current assets at $42.596 million.

179. The statements in ¶ 178 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory was correctly valued and expenses related to the Exchange Transaction and other debt issuance costs properly accounted for, the correct value of the Company's:

a. inventory had been overstated by 6.26%, and was actually $104.337 million; and

b. prepaid expenses and current assets had been overstated by 15.21%, and was actually $36.973 million.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

180.   The Q2 2025 10-Q further disclosed that the Company's gross margin (*i.e.*, gross profit divided by net revenues) was 11.5%.

181.   The statement in ¶ 180 above was false and misleading, however, as when the Company admitted its accounting errors, it further admitted that its actual gross margin was ***10.6%***.

182.   The Q2 2025 10-Q further disclosed that the Company's loss from operations was $34.912 million and net loss was $29.242 million.

183.   The statement in ¶ 182 above was false and misleading, however, because when the Company admitted its accounting errors, it further admitted that its actual loss from operations was $37.515 million and its net loss was $31.845 million.

184.   The Q2 2025 10-Q also purported to warn of certain risks that "may" or "could" materialize in connection with Beyond Meat's leasing arrangements. For example, the Q2 2025 10-Q stated, *inter alia*:

> Underutilization or cessation of our manufacturing facilities ***could*** adversely affect our gross margin and other operating results and we ***may*** be required to . . . write down our long-lived assets, or shorten the useful lives and accelerate depreciation of our assets[.]
>
> * * *
>
> We ***may*** not be able to build out or occupy the rest of the Campus Headquarters and are ***considering*** subleasing, assigning or otherwise transferring additional unoccupied space, or negotiating further partial lease terminations but ***may*** be unable to enter into or negotiate such an agreement or partial termination, which ***could*** have an adverse effect on our operating and financial results. An agreement to partially terminate, sublease, assign or otherwise transfer the unoccupied part of the Campus Headquarters would be subject to certain risks and uncertainties. For example, the agreement ***may*** not be completed on terms advantageous to us [and] . . . ***may*** result in impairment charges for [ROU] assets and prepaid lease costs and ***could*** have a negative impact on our financial condition and results of operations. In addition, a partial termination of the lease ***could*** result in a penalty payment to

53

exit the lease and non-cash write-off of prepaid lease costs, the amounts of which *could* be material and which *could* have a negative impact on our financial condition and results of operations.

185. The boilerplate risk warning in ¶ 184 above was a generic, boilerplate provision that contemplated mere hypotheticals and was not tailored to Defendants' actual known risks regarding a material impairment charge associated with Beyond Meat's long-lived assets, and was materially misleading for failing to disclose that the Company's long-lived assets were already impaired.

186. The Q2 2025 10-Q also represented that

> Our management, with the participation of our principal executive officer and our principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on that evaluation, our principal executive officer and principal financial officer have concluded that, *as of the end of the period covered by this Quarterly Report on Form 10-Q, our disclosure controls and procedures were effective* to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, *and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate*, to allow timely decisions regarding required disclosure.

187. The statement in ¶ 186 above was false and misleading because, based on Defendants' later admissions, at the time of the statement there necessarily was a material weakness in the Company's internal control and procedures concerning financial reporting, which Defendants knowingly or recklessly failed to disclose.

54

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

188.   Appended as exhibits to the Q2 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to Section 302 of SOX, in which Defendants Brown and Kutua each certified that (i) they had reviewed the Q2 2025 10-Q; (ii) the Q2 2025 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading with respect to the period covered by the report"; (iii) the Q2 2025 10-Q's "financial statements, and other financial information . . . fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; (iv) and Defendants Brown and Kutua had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures."

189.   Also appended as an exhibit to the Q2 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to 18 U.S.C. Section 1350, which attested that "[t]he [Q1 2025 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)" and "fairly presents, in all material respects, the financial condition and results of operations" of Beyond Meat.

190.   Each of the statements and excerpts from the exhibits to Beyond Meat's Q2 2025 10-Q was materially false and misleading because the Q2 2025 10-Q "omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and did not "fully comply with the requirements of Section 13(a) or 15(d) of the

55

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Exchange Act" because the Q2 2025 10-Q misrepresented and/or failed to disclose that: (i) there was a material weakness in Beyond Meat's internal control over financial reporting; (ii) the Company's inventories were inflated because it had not written off unsaleable or obsolete inventory as required by GAAP; (iii) the Company's prepaid expenses and other current assets were inflated because it had not properly accounted for expenses in connection with the Exchange Transaction and other debt issuance costs as required by GAAP; and (iv) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars and the Company would be required to record a material, non-cash impairment charge.

**D. Misstatements in Connection with Beyond Meat's Q3 2025 Financial Disclosures**

191. On November 10, 2025, Beyond Meat issued a press release reporting its financial results for Q3 2025. In the Q3 2025 Release, Defendants valued the Company's (i) inventory at $110.294 million; (ii) prepaid expenses and other current assets at $31.048 million; and (iii) gross profit at $7.230 million.

192. The statements in ¶ 191 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory was correctly valued and expenses related to the Exchange Transaction and other debt issuance costs properly accounted for, the correct value of the Company's:

a. inventory had been overstated by 8.39%, and was actually $101.760 million;

b. prepaid expenses and other current assets had been overstated by 130.75%, and was actually $13.455 million; and

c. gross profit had decreased by 27.7%, and was actually $5.228 million.

193. On November 12, 2025, Beyond Meat filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q2 ended September 27, 2025 (the "Q3 2025 10-Q").

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

194.   In the Q3 2025 10-Q, Defendants valued the Company's (i) inventory at $100.294 million; (ii) prepaid expenses and current assets at $31.048 million; and (iii) gross profit at $7.230 million.

195.   The statements in ¶ 194 above were knowingly or recklessly materially false and misleading because, as Defendants later admitted, when inventory was correctly valued and expenses related to the Exchange Transaction properly accounted for, the correct value of the Company's:

   a. inventory had been overstated by 8.39%, and was actually $101.760 million;

   b. prepaid expenses and other current assets had been overstated by 130.75%, and was actually $13.455 million; and

   c. gross profit had decreased by 27.7%, and was actually $5.228 million.

196.   The Q3 2025 10-Q, further disclosed that the Company's gross margin (*i.e.*, gross profit divided by net revenues) was 10.3%.

197.   The statement in ¶ 196 above was false and misleading, however, as when the Company admitted its accounting errors, it further admitted that its actual gross margin was *7.4%*, a 28.2% change. This error was particularly material to investors, because, according to Defendants, gross margin is one of the Company's key performance goals and one of four "most important financial performance measures used to link 'compensation actually paid' to" the Company's executive officers.

198.   In the Q3 2025 10-Q, Defendants also disclosed that the Company's loss from operations of $112.331 million and net loss of $110.681 million.

199.   The statement in ¶ 198 above was false and misleading, however, as when the Company admitted its accounting errors, it further admitted that its actual loss from operations was $98.107 million and its net loss was $97.008 million.

200.   Appended as exhibits to the Q3 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to Section 302 of SOX, in which

57

Defendants Brown and Kutua each certified that (i) they had reviewed the Q3 2025 10-Q; (ii) the Q3 2025 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances in which such statements were made, not misleading with respect to the period covered by the report"; (iii) the Q3 2025 10-Q's "financial statements, and other financial information . . . fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; and (iv) Defendants Brown and Kutua had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures."

201.   Also appended as an exhibit to the Q3 2025 10-Q were certifications signed by Defendants Brown and Kutua pursuant to 18 U.S.C. Section 1350, which attested that "[t]he [Q3 2025 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act] (15 U.S.C. 78m)" and "fairly presents, in all material respects, the financial condition and results of operations" of Beyond Meat.

202.   Each of the statements and excerpts from the exhibits to Beyond Meat's Q3 2025 10-Q was materially false and misleading because the Q3 2025 10-Q "omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading" and did not "fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act" because the Q3 2025 10-Q misrepresented and/or failed to disclose that: (i) there was a material weakness in Beyond Meat's internal control over

58

financial reporting; (ii) the Company's inventories were inflated because it had not written off unsaleable or obsolete inventory as required by GAAP; (iii) the Company's prepaid expenses and other current assets were inflated because it had not properly accounted for expenses in connection with the Exchange Transaction as required by GAAP; and (iv) the book value of certain of Beyond Meat's long-lived assets exceeded their fair value by tens of millions of dollars and the Company would be required to record a material, non-cash impairment charge.

## THE TRUTH BEGINS TO EMERGE

203. The truth began to emerge on October 24, 2025, when, during pre-market hours, Beyond Meat filed the Q3 2025 8-K. Therein, Defendants revealed that the Company expected to record a "material," unquantified non-cash impairment charge related to certain of its long-lived assets, stating, in relevant part:

> *[T]he Company expects to record a non-cash impairment charge for the three months ended September 27, 2025, related to certain of its long-lived assets.* The Company's recoverability test . . . preliminarily indicated that the carrying amount of certain of its long-lived assets was not recoverable from the projected undiscounted future cash flows of the relevant asset group. *Although the impairment charge is expected to be material, the Company is not yet able to reasonably quantify the amount at this time.*

204. The foregoing disclosure gained immediate media attention. For example, the same day during pre-market hours, *The Wall Street Journal* published an article entitled "Beyond Meat Expects Impairment Charge, Revenue In Line With Target," which likewise noted that the Company "anticipated a noncash impairment charge tied to some long-lived assets" that "it expects . . . to be material," but "can't yet quantify the amount." The same day, other news outlets that regularly cover the securities markets similarly reported on the foregoing disclosure, including, *inter alia*, *Benzinga* in an article entitled "Beyond Meat Stock Slips, Traders Chew On Q3 Estimates," which noted, *inter alia*, that the "large non-

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

cash impairment" "mean[s] the book value of some long-term assets (factories, equipment, etc.) is higher than what they're worth and those assets must be 'written down.'"

205.    Also on October 24, 2025, multiple analysts issued notes addressing Beyond Meat's disclosures in the Q3 2025 8-K. For example, Mizuho Securities USA ("Mizuho") stated, in relevant part, that "[a]lthough non-cash in nature, the charge reinforces a more subdued multi-year outlook for operations" and "confirm[s] our reduced estimates for LT [long-term] 10-yr U.S. plant-based meat category sales ($2.4B from prior $4B)." Similarly, BTIG stated, in relevant part, that "we think the [Company's] primary motivation [for filing the Q3 2025 8-K] was to foretell the large asset impairment charge coming with 3Q earnings" and that "[w]e remain on the sidelines as we continue to see no recovery in sales trends, no progress towards sustainable financials with cash burn likely worse than last year, and tough financing arrangements[.]"

206.    Following Beyond Meat's filing of the Q3 2025 8-K, the Company's stock price fell $0.66 per share, or 23.06%, to close at $2.19 per share on October 24, 2025.

207.    On November 3, 2025, during pre-market hours, Defendants issued the Q3 2025 Delay Notice, which stated that the Company needed additional time before filing the Q3 2025 10-Q to complete the previously disclosed impairment review. Specifically, the press release stated, in relevant part:

> Beyond Meat . . . is rescheduling the reporting of its financial results for the third quarter ended September 27, 2025 to Tuesday, November 11, 2025 after market close.
>
> As previously disclosed on Form 8-K filed on October 24, 2025, the Company expects to record a non-cash impairment charge for the three months ended September 27, 2025 related to certain of its long-lived assets. Although the Company expects this charge to be material, the Company is not yet able to reasonably quantify the

60

amount, and requires additional time, resources and effort to finalize its assessment, and therefore is rescheduling its previously-announced conference call to Tuesday, November 11, 2025.

208. This disclosure, too, was the subject of considerable and immediate media attention, including articles published by a slew of media outlets the same day. For example, in an article entitled "Beyond Meat Shares Fall as Impairment Charge Delays 3Q Results," *Bloomberg* reported that "Beyond Meat shares are down 8.2% in premarket trading after the plant-based protein company postponed the release of its 3Q results to Nov. 11 as it finalizes an assessment of a material non-cash impairment charge tied to certain long-lived assets." Similarly, in an article entitled "Beyond Meat delays quarterly earnings report to November 11," *Reuters*, too, reported that the Q3 2025 Delay Notice had resulted in a sharp decline in Beyond Meat's stock price, stating that the Company "is delaying its third-quarter results report by a week as it requires more time to quantify an impairment charge related to some of its assets, sending its shares about 12% lower in early trading on Monday." *Yahoo! Finance*, *Business Insider*, *Seeking Alpha*, and *TalkMarkets*, among other investor news outlets, similarly reported on the decline in Beyond Meat's stock price as investors digested the Company's disclosures in the Q3 2025 Delay Notice.

209. Ultimately, following Beyond Meat's publication of the Q3 2025 Delay Notice, the Company's stock price fell $0.27 per share, or 16.01%, to close at $1.39 per share on November 3, 2025.

210. The truth continued to leak out and concealed risks continued to emerge on November 7, 2025, when, after markets closed, Defendants filed a Notification of Late Filing on Form 12b-25, which disclosed that, when Beyond Meat was eventually able to file its Q3 2025 10-Q:

the Company expects to report that *a material weakness in the Company's internal control over financial*

61

*reporting existed as of September 27, 2025, related to controls associated with the accounting for non-recurring and complex transactions*. Management has preliminarily concluded that inadequate technical resources are currently in place to effectively evaluate and determine the proper recording of such transactions, and the Company has begun to work on a remediation plan. As a result of the expected material weakness, the Company believes that its internal control over financial reporting was not effective, and its disclosure controls and procedures were not effective, as of September 27, 2025.

211. As with the Company's disclosures over the prior two weeks, this disclosure was widely disseminated by the media. Within minutes of the filings, *Bloomberg* published a release entitled, "Beyond Meat Delays 10-Q, Expects to Report Material Weakness," which noted that "Management does not anticipate making any adjustments to its previously issued financial statements." Less than two hours later a different *Bloomberg* journalist followed up with an article entitled, "Beyond Meat Warns of 'Material Weakness' in Financial Reporting."

212. On this news, the Company's stock price fell $0.05 per share, or 3.6%, to close at $1.34 per share on November 10, 2025.

213. Minutes after the markets closed on November 10, 2025, Beyond Meat issued a press release reporting its financial results for Q3 2025 (the "Q3 2025 Earnings Release"). Among other results, Beyond Meat reported that its loss from operations for the quarter "was $112.3 million, or operating margin of -160.0%, compared to loss from operations of $30.9 million, or operating margin of -38.2%, in the year-ago period[,]" which "included *$77.4 million* in non-cash impairment charges related to certain of the Company's long-lived assets."

214. On this news, Beyond Meat's stock price fell $0.12 per share, or 8.96%, to close at $1.22 per share on November 11, 2025.

215. Minutes after the markets closed on November 11, 2025, Beyond Meat hosted a conference call with investors and analysts to discuss its financial results

62

for Q3 2025 (the "Q3 2025 Earnings Call"). During the call, Defendant Kutua disclosed, in relevant part, that "[t]he total impairment amount of $77.4 million was . . . allocated to PP&E, operating lease ROU assets and prepaid lease costs on our balance sheet." Neither the Q3 2025 Earnings Release nor Defendant Kutua, however, disclosed that the Company had inflated its inventory by $8.5 million, miscategorized $14.1 million in costs associated with the Exchange Transaction, and failed to take a $3.4 million impairment of long-lived assets associated with the Company's exit from China, all of which had the effect of reducing Beyond Meat's net loss. Indeed, the Q3 2025 10-Q expressly stated that the material weakness was solely related to the Company's "process-level controls associated with the identification and accounting" for "non-recurring and complex transactions."

216.   As with the Q3 2025 8-K and Delay Notice, Defendants' disclosures in the Q3 2025 Earnings Release and Call shocked the market. For example, on November 10, 2025, investor news website *Stocktwits* published an article entitled "Is Beyond Meat's 'Meme' Moment Over? Stock Plunges After-Hours As $81M Charge, Shrinking Sales Dent Sentiment," reporting that the Company's "shares tumbled 9% in after-hours trading on Monday after the company's quarterly report revealed [*inter alia*] . . . [the] significant impairment charge." Similarly, during pre-market hours the following day, *The Motely Fool* published an article entitled "No Bottom in Sight for Beyond Meat's Crashing Sales," stating, in relevant part, that the "impairment charge of $77.4 million against long-lived assets in the third quarter . . . dragged down the [Company's] bottom line." Between November 10 and 11, 2025, various other news outlets including, *inter alia*, *The Wall Street Journal*, *Reuters*, and *Seeking Alpha* similarly published articles addressing Defendants' disclosures in the Q3 2025 Earnings Release and Call.

217.   Multiple analysts, too, reacted negatively to Defendants' disclosures in the Q3 2025 Earnings Release and Call. For example, on November 11, 2025,

63

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Barclays Research published a note stating that Beyond Meat's "[p]rofits were overall weaker than expected as [it] faced a significant non-cash impairment charge of $77.4mn related to certain long-lived assets" and that "[b]ottom line was a significant miss due to the aforementioned one-time costs as well as a significant increase in interest expense." Similarly, the same day, Mizuho published a note stating that Beyond Meat's "[r]esults confirmed a sizable impairment charge ($77MM) and Q4 revenue guided below consensus[, which] implies weaker yr/yr growth vs. Q3 despite softer comp." BTIG issued a similar note on November 12, 2025, stating, *inter alia*, that "we don't have enough confidence the [Company's] business can return to sustainable, positive EBITDA" within the next two years, and that Defendants' "gross margin outlook has consistently been overly optimistic[.]"

218. Following Defendants' disclosure of the $77.4 million writedown, Beyond Meat's stock price fell an additional $0.11 per share, or 8.61%, to close at $1.12 per share on November 12, 2025.

219. The truth continued to emerge and concealed risks continued to materialize on March 16, 2026, when the Defendants belatedly disclosed that the filing of its Annual Report on Form 10-K for the 2025 Fiscal Year would be delayed. Shortly after markets had closed, Defendants issued a press release stating that:

> delay the filing of its Annual Report on Form 10-K for the full year ended December 31, 2025. The filing is delayed because the Company requires additional time to complete a review and analysis related to its inventory balances, ***including amounts recorded for the provision of excess and obsolete inventory***….As a result of these issues, management expects to report that a material weakness in the Company's internal control over financial reporting existed as of December 31, 2025, related to controls associated with the accounting for its inventory provision.

64

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

220. This was the first time investors learned that the material weakness was connected to the Company's inventory, a fact that the press quickly picked up on. For example, on March 17, 2026, the website *Seeking Alpha* published an article entitled, "Wall Street Breakfast Podcast: Beyond Meat Slides On Report Delay," which observed that the Company's share price had already slid 4.6% in pre-market trading after disclosing the material weakness. The next day, on March 18, 2026, *Bloomberg* published an article entitled "Beyond Meat delays FY25 results amid accounting investigation," which noted that the weakness was an evolution of the issues first disclosed by the Company the prior November. Likewise, *TheStreet.com* published an article entitled, "Beyond Meat Has an Inventory Problem," which linked an expected upcoming announcement of revenue losses to the disclosed material weakness concerning "inventory balance issue." Analysts picked up on the disclosure as well, with Barclays quickly releasing a report entitled "4Q Preliminary Results and Delayed 10-K" that kept the Company rated "underweight" in part because of the disclosure of inventory problems.

221. Following Defendants' disclosure of the second material weakness, Beyond Meat's stock price fell an additional $0.06 per share, or 7.37%, to close at $0.75 per share on March 17, 2026.

222. The truth fully emerged and the concealed risks fully materialized on March 31, 2026, when, after the close of trading, Defendants issued a press release belatedly reporting the Company's fourth quarter and full year 2025 financial results ("FY25 Earnings Release").

223. Among other things, the FY25 Earnings Release disclosed that Beyond Meat's quarterly financial statements for the first three fiscal quarters of 2025 contained material misstatements (which Defendants absurdly attempted to characterize as immaterial), including that (i) the value of the Company's inventory was overstated in each of the first three quarters of 2025 because Defendants had

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

failed to write off excess and obsolete inventory; (ii) Defendants had misclassified $14.1 million in expenses related to the Exchange Transaction as assets not expenses; and (iii) the $77.4 impairment of long-lived assets disclosed in November 2025 was overstated by $26.1 million.

224.   In addition, the FY25 Earnings Release further disclosed that although GAAP required Beyond Meat to record $14.1 million of costs for professional services related to the Exchange Transaction on its income statement as "selling, general, and administrative expenses," Defendants had capitalized the $14.1 million on its balance sheet as "prepaid expenses and other current assets,", which had the effect of *understating* the Company's loss from operations by 2.0%, or $2.3 million, in Q1 2025 and 5.3%, or $1.9 million in Q2 2025, as well as failing to properly record $9.9 million expenses in Q3 2025, which represented 8.8% of the $122.3 million loss from operations the Company initially reported, and 21.1% of the loss from operations the Company ultimately reported.

225.   Following Defendants' disclosure of their false statements in each of the first three quarters of 2025, Beyond Meat's stock price fell an additional $0.08 per share, or 11.57%, to close at $0.62 per share on April 1, 2026.

226.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

227.   As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in the Substantive Allegations and Materially False and Misleading Statements sections above, for the following reasons:

- Defendants had a motive for the fraud in that the Beyond Meat had $1.142 billion in debt against only $275 million in annual revenues and with only

$102 million in cash in the bank. Defendants were thus motivated to conceal the overstated inventory, mischaracterized Exchange Transaction expenses, impaired long-term assets, and material weaknesses in internal control over financial reporting so that they could negotiate more favorable terms for the Exchange Transaction.

- Defendants' Q3 2025 10-Q averred that the initial long-lived asset impairment and material weakness concerning accounting for complex non-recurring transactions were identified prior to September 27, 2025. Accordingly, Defendants' motive for the fraud is also reflected in Defendants' suspiciously timed disclosure of the long-lived asset impairment only days after over 96% of 2027 Noteholders had tendered their 2027 Notes and the revocation deadline had passed. Likewise, Defendants conveniently waited to disclose the initial material weakness in accounting controls concerning non-routine and complex transactions until only days after the Exchange Transaction had settled, and did not disclose the second material weakness, inflated inventory, miscategorized Exchange Transaction expenses, and other misstatements in the Q1, Q2, and Q3 2025 10-Qs until after the Exchange Transaction had closed.

- Defendants knew or recklessly disregarded the truth about overstated inventory and impaired long-lived assets based on the pallets of unsold, unusable inventory sitting in warehouses before and during the Class Period and the Global Operations Review.

- Defendant Brown also knew or recklessly disregarded the inventory issues given his highly engaged, micromanaging and overbearing management style and focus on product sales.

- Defendants made misleading statements in response to direct queries from analysts.

- Each of the Q1, Q2, and Q3 10-Qs expressly represented that Defendants Brown and Kutua had personally evaluated the effectiveness of the Company's "disclosure controls and procedures" and determined that those controls and procedures were effective. Appended to the Q1, Q2, and Q3 10-Qs were certifications signed by Defendants Brown and Kutua affirming this as well. Accordingly, Defendants had access to information, including the fact of the existence of the material weakness in the Beyond Meat's controls, at the time the Company made the misrepresentations described above.

67

228. In addition to the above allegations, which on their own create a strong inference of scienter, additional factors support a strong inference of the Individual Defendants' scienter, including: (i) Defendants Brown and Kutua's high-level positions within Beyond Meat, (ii) that the misstatements and omissions of material facts concern Beyond Meat's core operations, about which the Individual Defendants were repeatedly questioned and spoke; and (iii) corporate scienter.

## A. Individual Defendants' High-Level Positions Within Beyond Meat

229. Defendant Brown was President and CEO of Beyond Meat at all relevant times. Beyond Meat identified Defendant Brown as an "Executive Officer" of the Company during the Class Period. As Beyond Meat's CEO, Defendant Brown was the head of the Company's management and operations teams. Defendant Brown, by virtue of his responsibilities and activities as CEO, was privy to all material information concerning Beyond Meat's operations, including the Global Operations Review and the Company's valuations of long-lived assets, inventory amounts and valuations, use of the Campus Headquarters, efforts in connection with the Exchange Transaction, and reductions in headcount.

230. Defendant Kutua was the CFO and Treasurer at Beyond Meat at all relevant times. Beyond Meat identified Defendant Kutua as an "Executive Officer" of the Company during the Class Period. Defendant Kutua, by virtue of his responsibilities and activities as CFO and Treasurer, was privy to all material information concerning Beyond Meat's operations, including the Global Operations Review and the Company's valuations of long-lived assets, inventory amounts and valuations, use of the Campus Headquarters, efforts in connection with the Exchange Transaction, and reductions in headcount.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**B. Inventory and Asset Valuations Were Essential to Beyond Meat**

231. Before and during the Class Period, Defendants repeatedly emphasized the importance of the Global Operations Review, including inventory management, to Beyond Meat's business.

232. For example, the 2024 10-K and Q1, Q2, and Q3 2025 10-Qs, *i.e.*, every 10-K and 10-Q filed with the SEC during the Class Period, reminded investors that Beyond Meat had pivoted its focus toward "sustainable long-term growth supported by three pillars," one of which was "inventory reduction and cash flow generation through more efficient inventory management."

233. In addition, the 2024 10-K and Q1, Q2, and Q3 2025 10-Qs also reminded investors that the Company was undergoing the Global Operations Review, which focused on, among other things, "non-cash charges such as provision for excess and obsolete inventory and potential additional impairment charges, write-offs and disposals of fixed assets and losses on sale and write-down of fixed assets."

234. Further, the 2024 10-K identified "Inventory—Provision for Excess and Obsolete Raw Materials and Work in Process Inventory" as a "critical audit matter," which meant that the valuation was of particular importance to Beyond Meat's auditors, and accordingly a subject of focus for Defendants as well.

235. Accordingly, it is appropriate to presume that Defendants were apprised of, had access to, or had actual knowledge of all material information related to Beyond Meat, its inventory amounts and valuations, and its valuations of long-lived assets.

236. Further, by virtue of their receipt of information reflecting the true facts regarding Beyond Meat's operations, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary

69

information concerning Beyond Meat, Defendants Brown and Kutua were active and culpable participants in the fraudulent scheme alleged herein. Defendants Brown and Kutua knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Defendants Brown and Kutua.

## C. **Corporate Scienter**

237. The allegations above also establish a strong inference that Beyond Meat as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Defendants Brown and Kutua, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Beyond Meat's true operating condition and present and expected financial performance from the investing public. By concealing these material facts from investors, Beyond Meat maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

## **PLAINTIFFS' CLASS ACTION ALLEGATIONS**

238. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Beyond Meat securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and

70

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

239. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Beyond Meat securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Beyond Meat or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

240. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

241. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

242. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Beyond Meat;

71

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- whether the Individual Defendants caused Beyond Meat to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Beyond Meat securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

243. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

244. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Beyond Meat securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

72

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Beyond Meat securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

245. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

246. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

247. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

248. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

249. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they

73

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Beyond Meat securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Beyond Meat securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

250.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Beyond Meat securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Beyond Meat's finances and business prospects.

251.    By virtue of their positions at Beyond Meat, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

252. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Beyond Meat, the Individual Defendants had knowledge of the details of Beyond Meat's internal affairs.

253. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Beyond Meat. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Beyond Meat's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Beyond Meat securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Beyond Meat's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Beyond Meat securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

254. During the Class Period, Beyond Meat securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Beyond Meat securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise

75

acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Beyond Meat securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Beyond Meat securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

255. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

256. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

257. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

258. During the Class Period, the Individual Defendants participated in the operation and management of Beyond Meat, and conducted and participated, directly and indirectly, in the conduct of Beyond Meat's business affairs. Because of their senior positions, they knew the adverse non-public information about Beyond Meat's misstatement of income and expenses and false financial statements.

259. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information

76

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

with respect to Beyond Meat's financial condition and results of operations, and to correct promptly any public statements issued by Beyond Meat which had become materially false or misleading.

260. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Beyond Meat disseminated in the marketplace during the Class Period concerning Beyond Meat's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Beyond Meat to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Beyond Meat within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Beyond Meat securities.

261. Each of the Individual Defendants, therefore, acted as a controlling person of Beyond Meat. By reason of their senior management positions and/or being directors of Beyond Meat, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Beyond Meat to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Beyond Meat and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

262. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Beyond Meat.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: June 1, 2026                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Brian Calandra (Admitted *pro hac vice*)
Jeremy Lieberman (*pro hac* forthcoming)
600 Third Ave. 21st Floor
New York, NY 10016

*Attorneys for Co-Lead Plaintiffs Brandon Mitchell Waldaias, Aaron Saran and Co-Lead Counsel for the putative Class*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

78

Matthew M. Guiney (Admitted *pro hac vice*)
Patrick Donovan (Admitted *pro hac vice*)
Rourke C. Donahue (Admitted *pro hac vice*)
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Guiney@whafh.com
Donovan@whafh.com
Donahue@whafh.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Betsy C. Manifold (182450)
Rachele R. Byrd (190634)
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Email: manifold@whafh.com Email: byrd@whafh.com

*Attorneys for Co-Lead Plaintiff Brandon Barclay and Co-Lead Counsel for the putative Class*

**HOLZER & HOLZER, LLC**
Corey D. Holzer (*pro hac vice* application forthcoming)
cholzer@holzerlaw.com
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Additional counsel for Plaintiff Aaron Saran*

79

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS